## TAYLOR OIL & GAS CO. v. PIERCE–FORDYCE OIL ASS'N. (No. 6249.)

(Court of Civil Appeals of Texas. Austin. Nov. 22, 1920. Rehearing Denied Jan. 5, 1921.)

**1. Sales ⬤⟳363—In action to recover a price fixed at regular market quotations, evidence held to present a jury question.**

In an action to recover on an oil sale contract providing for payment of the "regularly established and published market quotations," in that oil field, evidence as to the market quotations of a certain oil pipe line company being bona fide *held* sufficient to make a jury question as to their being regularly established market quotations.

**2. Sales ⬤⟳76—Where contract sold oil at published market quotations, the price published by a company subsequently entering the field must be considered.**

Where one oil company agreed to purchase from another, price to be the "regularly established and published market quotations" "as * * * now established" in that oil field, where at the time of the contract a certain company had not begun posting prices for oil in their field, but later did so, its prices are to be considered.

**3. Sales ⬤⟳76—Contract providing for settlement at regularly established market quotations in oil field cannot be ignored.**

Where a contract for sale of oil fixed the price at the regularly established market quotations in that field on the 1st and 16th of each month, such standard cannot be ignored and settlement required based on the real market value as shown by sales.

**4. Sales ⬤⟳76 — Provision for settlement at posted market quotations may not be ignored for slight variance with general buying.**

Where oil was sold, payments to be made at "regularly established and published market

quotations" in that field, which then fairly reflected market conditions, if the quotations should cease to approximately represent the price being paid for oil, the standard would fail, but it cannot be ignored for mere slight differences between the quotations and the prices established by the general consensus of buying by others not posting.

5. Sales ⬳76—Where oil was sold, payment at regular market quotations, if quotations ceased to represent price, the jury should consider sales to fix real market quotations.

In a seller's action for oil sold under agreement fixing price at the "regularly established and published market quotations," if the price published did not truly reflect the buying price, the jury should consider that companies were actually paying higher prices, although under contracts somewhat different from those prevailing when the contract in suit was made, in order to determine the real market quotations.

6. Sales ⬳76—Where the contract standard of prices ceased to represent market value, price determined by usual tests.

Where oil was sold, payment to be made from time to time at "regularly published market quotations" in that field, if it should be found that by reason of competitive conditions or otherwise such quotations ceased to represent approximately the real market value, then the contract standard must be regarded as having failed, and under the spirit of the contract the price will be determined by the usual tests and proof.

7. Sales ⬳76 — Under agreement for settlement from time to time a published market price, additional premiums subsequently paid must be added to the quotations.

Where a contract for sale of oil provided that the quoted market price in that field should be the basis of settlement from time to time, and there subsequently developed a system for payment of a premium over and above such price, such premium must be regarded as a part of the market price for settlement.

Appeal from District Court, Williamson County; Ireland Graves, Judge.

Suit by the Taylor Oil & Gas Company against the Pierce-Fordyce Oil Association. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Wilcox & Graves, of Georgetown, and Brooks, Hart & Woodward, of Austin, for appellant.

Capps, Cantey, Hanger & Short, of Ft. Worth, and White, Cartledge & Wilcox, of Austin, for appellee.

BRADY, J. This suit was instituted by appellant, the Taylor Oil & Gas Company, against appellee, Pierce-Fordyce Oil Association, to recover a balance alleged to be due by the latter to the former upon a sale of oil under a written contract. Defendant denied any liability, and alleged in its an-

swer that it had paid plaintiff the full contract price of all oil delivered by plaintiff to it under the contract. At the conclusion of the plaintiff's evidence, the trial court peremptorily instructed the jury to return a verdict for the defendant, which was done, and judgment was entered thereon for defendant.

### Opinion.

[1, 2] The first assignment of error is, in substance, that the trial court erred in giving the peremptory instruction, because there was evidence introduced at the trial which would have warranted a jury in finding that the Dixie Oil Company, during the period covered by the contract, had posted in the Electra field prices which represented and were the regularly established and published market quotations for oil in that field, and because the evidence further showed that defendant had refused to pay plaintiff for crude oil furnished under the terms of the contract sued on, in accordance with said prices, and that, if such prices be accepted as the true basis of settlement for the oil, defendant was indebted to plaintiff for a large sum of money under the contract.

The proposition under this assignment is substantially the same and is to the effect that the trial court, under the evidence, should not have held as a matter of law that the prices posted by the pipe line companies and published in oil journals should control.

The stipulation in the contract with relation to the price of the oil was as follows:

"The mutually agreed price of said oil for said period of twelve (12) months from this date, between the parties hereto, is and shall be the regularly established and published market quotations for the highest grade crude oil, as grades (quotations) are now established in the Electra market, at Electra, Wichita county, Tex., on the 1st and 16th day of each successive month during the life of his contract, said price being based upon the price per barrel of 42 U. S. gallons each; that is to say, that on the 1st day and on the 16th day of each month during the life of this contract, the number of barrels of oil furnished by the party of the first part to the party of the second part hereunder prior to such date and since the last settlement hereunder shall be ascertained, and the regularly established and published market quotations for the highest grade crude oil, as grades (quotations) are now established in said Electra oil field on said date shall be also ascertained, and the party of the second part shall pay to the party of the first part said price per barrel for each barrel of oil that has been furnished to the party of the second part by the party of the first part between such date and the last settlement between the parties hereto."

It appears from the evidence that at the time this contract was made there were certain pipe line companies which were posting

prices for crude oil at their offices in Electra field, and that the same prices were being published in oil journals as market quotations. At this time the Dixie Oil Company was not posting any prices. However, there was evidence that such posted prices at the time of the contract meant the same as market price to the oil trade, generally speaking.

The contract was executed January 21, 1916, and one of the officers of the Magnolia Petroleum Company, a pipe line company which was posting prices in the Electra field, testified that at the date of the contract, and for a long period of time prior thereto, the pipe line quotations at Electra represented substantially the price at which the bulk of oil produced at Electra was bought and sold in that field, as far as his company was concerned, and that it was his understanding that other companies were paying the same price, that about a month later, because of abnormal competitive conditions, the pipe line quotations which continued to be posted by the pipe line companies ceased to represent the market price or value of the oil, and that this condition continued for several months thereafter.

For about a month after the execution of the contract the price posted by the pipe line companies and published by the oil journals was $1.30 a barrel, and thereafter, until about the 1st of August of the same year, such posted and published price was $1.55 a barrel. However, shortly after the execution of this contract, the Dixie Oil & Refining Company, according to the evidence, posted a price at Electra of $1.75 a barrel, upon instructions and authority of the president and general manager of such company. There was evidence showing that this price was a bona fide one, and that the company was able and willing to buy the oil on the market at that price, and that such company bought all the oil it could get at this posted price and even at higher prices. The price posted by the Dixie Company was placed on a bulletin board in the lobby of the Denver Hotel, which was the largest hotel in Electra, and there was testimony showing it to be the most public place there. There was also testimony showing that this bulletin board was 2x3 or 4, and was similar to the bulletin boards in other offices, and the announcement read in substance: "Dixie Refining & Oil Company of San Antonio—We will pay $1.75 per barrel in the Electra field."

In view of this and other evidence in the record, we have concluded that the first assignment should be sustained, and that the trial court erred in giving a peremptory instruction to the jury, because an issue of fact had been made for the determination of the jury under the standard fixed by the contract for determining the price. We do not agree to the contention of appellee that

because, at the time of the contract, market quotations were regularly established by the posting of prices by certain pipe line companies and the publishing in the oil journals, as such companies continued to post prices, their prices must continue to be the standard to determine the price throughout the life of the contract. No language is used in the contract requiring the question to be determined by the prices quoted by the oil companies then buying oil at Electra—in other words, the pipe line companies then operating at Electra. There is nothing to indicate that the parties intended that the quotations of any particular company or combination of companies should control, but it does provide that the governing quotations shall be the quotations "as now established at Electra." The method of establishing the quotations is what the parties referred to, and not the person or company by which the quotations were made.

When the Dixie Oil Company afterwards entered that field and posted what were testified to as genuine bona fide market quotations at which they were able and willing to buy all the oil offered, and did in fact buy quantities of oil at that price and higher, we think these facts raised an issue for the jury to determine whether they were, at the respective settlement dates, the regularly established market quotations. We think it is immaterial that at the time of the contract the Dixie Oil Company had not begun posting prices for oil at Electra. This circumstance does not bar its posted prices from consideration in determining the price to be paid by appellee for appellant's oil under the standard prescribed in the contract.

For the reasons indicated, the first assignment will be sustained.

[3, 4] Among other questions raised in the brief for appellant is the contention that the entire contract shows that the parties intended that the seller should receive the market price or value of the oil prevailing at Electra at each settlement date, as determined by the consensus of buying and selling there, regardless of any posted or published market quotations. Or, stated differently, appellant contends that, unless the prices posted and published as market quotations did truly and accurately represent the real market price, as shown by the sales in that field, they should be ignored, and the actual selling price would prevail. We cannot assent to this interpretation of the contract if in fact throughout the life of the contract there were regularly established market quotations in the Electra field. Such is the standard fixed in the contract itself, and it was probably selected by the parties for the very purpose of preventing disputes as to what constituted market price or value as ascertained by the usual tests. To ignore this standard would be for the court to make

a new contract for the parties, and we cannot sanction the broad interpretation contended for by appellant. However, the evidence shows that at the time the contract was made the market quotations in the Electra field, posted by the pipe line companies and published in oil journals, fairly reflected the market condition; and it is to be presumed that the parties had in mind at least that the standard selected by them would approximate the prices being paid for oil bought and sold on that market. Therefore, if the evidence should show, as seems to be indicated by testimony in the record, that the posted and published quotations ceased to approximately represent the price being paid for oil in that market, and thereafter bore no reasonable relation to the actual market price, we should then have the case of the standard selected by the parties ceasing to function, and, under the spirit of the contract, failing as a true test of determining the price. However, we do not wish to be understood as holding that, if the jury should find that there were regularly established market quotations throughout the life of the contract, which were genuine and bona fide, they would not govern or control simply because they varied or differed somewhat from the price being paid in the field as determined by isolated transactions or sporadic instances; nor do we think that such standard is to be ignored if the evidence shows that it continued to exist throughout the contract, merely because there might be a slight difference in the regular market quotations, according to the method established at the time of the contract, and the prices which might be established by the general consensus of buying and selling by others not posting such prices.

[5] There was evidence introduced on the trial showing that shortly after this contract was made some, if not all, the pipe line companies, although posting a price of $1.55 a barrel, devised a new form of contract under which they bought oil for a long period of time, generally from six months to a year, at a fixed price throughout such period; such flat price being $1.70 a barrel. After adopting the new form of contracts and canceling their old forms, the pipe line companies advised their customers of the new contracts and the flat price they were offering for oil under such terms, but continued to post the lower price of $1.55, and bought large quantities of oil at the higher price. In view of the substantial difference in the terms of the new contracts and the certainty of obtaining oil at a fixed price, regardless of fluctuations in market during the terms of the contracts, we cannot say that the higher price of $1.70 would control as the market quotations of the pipe line companies. If the price of $1.55, which was continued to be published and quoted, did not truly reflect the price at which the companies were buying oil, and thus became a mere arbitrary price, it would be a matter proper for the consideration of the jury that the companies were actually paying higher prices, although under contracts somewhat different from those prevailing at the time the contract was made. In other words, the new and higher prices, notwithstanding the change in contracts, might properly be considered by the jury in arriving at what were really the established market quotations, if any.

[6] Furthermore, we are of the view that, if the evidence should show that during the contract there ceased to be any regularly established market quotations in the Electra field, either by reason of competitive conditions or otherwise, which at least approximately represented the real market value of the oil, the standard prescribed in the contract must be regarded as having failed. In such circumstances, under the plain spirit of the contract, the price to be paid will be determined by the usual tests and proof.

[7] We think we have sufficiently indicated our views upon the questions discussed in the briefs, with the exception of the point raised by appellant that, since the evidence showed that, in addition to the posted price, a premium was paid for all oil purchased, and that the oil could not be bought at even the highest posted price without paying such premium, the same became a part of the market price, and that this court should hold that "market price comprehends and includes the entire cost of the oil," whether such cost be in part disguised as premium or otherwise.

Upon this question we entertain the opinion that, if by the uniform usage of the trade it was understood and implied that a "premium" would be added to the posted and published prices and would in all instances be paid to the seller, such premium would be regarded as a part of the cost of the oil to the buyer, and would substantially be a part of the regularly established market quotations, although not specifically mentioned in such quotations. However, if the payment of the premium was only occasional, or when made by special agreement, it would not be part of the market quotations.

For the errors indicated, the judgment will be reversed, and the cause remanded.

Reversed and remanded.