

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-12-00201-CV

MARY ELLEN LITTLE, BECKY                                         APPELLANTS
LITTLE ANTHONY, TRICIA ROSE
JACKSON, ERIC JOHN LITTLE,
JAMES SHANNON LITTLE, WIDOW
AND CHILDREN OF JOHNNY
JAMES LITTLE, DECEASED, AND
DEBRA DEE KEEFER, AS
INDEPENDENT EXECUTRIX OF
THE ESTATE OF JOHNNY JAMES
LITTLE, DECEASED

V.

DELTA STEEL, INC. AND                                            APPELLEES
RELIANCE STEEL & ALUMINUM
CO.

----------

### FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

# OPINION

----------

In two issues, appellants, whom we have listed above, appeal the final judgment that the trial court rendered in favor of appellees Delta Steel, Inc. (Delta Steel) and its parent company, Reliance Steel & Aluminum Co. (Reliance). Appellants contend that the trial court erred by denying their motions for summary judgment, granting appellees' motions for summary judgment, and making allegedly incorrect rulings on appellants' objections to appellees' summary judgment evidence. We affirm in part and reverse and remand in part.

## Background Facts

Johnny Little began working for Delta Steel, a steel fabrication company, in January 1997. During Little's employment, in which he operated cranes at Delta Steel's Fort Worth plant,[1] he designated his spouse, Mary, to receive benefits if he died.

In March 2009, Delta Steel's Fort Worth plant had four overhead cranes that used electromagnets to lift steel. On March 11, 2009, a thunderstorm, containing driving rain and lighting, moved near Delta Steel's Fort Worth plant. At a little after 6 a.m. that day, Little was using an electromagnetic crane to move a steel plate when the plate dislodged from the magnet, fell, crushed him, and killed him.

---

[1]Delta Steel's corporate office is in Houston.

On the date of Little's death, three of the cranes at Delta Steel's Fort Worth plant had battery backup units, but the crane that Little was operating when he died did not have such a unit. Battery backup units allow a crane's electromagnetic system to hold a steel load for a temporary period of time even if the crane's normal electromagnetic system is not functioning properly. According to Jackie Walters, who maintains equipment for Delta Steel at its Fort Worth location and who previously worked for a company that inspected Delta Steel's cranes, if an electromagnetic crane that does not have a battery backup unit loses power, it will "drop whatever it has on it." Before and after Walters began working for Delta Steel, he notified one of Delta Steel's officials about the lack of a battery backup unit on the crane that Little was using when he died.

Appellants initially sued only Delta Steel for the events related to Little's death. In their May 2009 original petition, appellants pled for wrongful death and survival damages, including punitive damages, contending that Little's death had been proximately caused by Delta Steel's negligence and gross negligence. Particularly, appellants alleged that Delta Steel had failed to provide a reasonably safe place to work, had failed to provide safe equipment for employees to work with, and had failed to properly train and supervise employees.

Appellants later amended their petition to add Reliance as a defendant, asserting that Reliance owned Delta Steel, had undertaken a responsibility to ensure safety for Delta Steel's employees, and had negligently and grossly negligently failed to perform that responsibility. In their second amended petition,

3

appellants alleged, among other facts, that Little's death was caused by a failure of a crane's electromagnetic lifting system, that Delta Steel had made a "conscious decision to remove the battery backup unit from the . . . crane," and that Delta Steel had ignored warnings about the danger of employees operating a crane that did not have a battery backup unit.[2]

Appellees answered appellants' claims by asserting a general denial and by pleading several affirmative defenses, including that they were "subscribers to [workers'] compensation insurance at the time of the injuries, and therefore, [appellants were] barred from any recovery." In a later pleading, appellees also contended that appellants were estopped from claiming damages outside of workers' compensation because they had elected to receive workers' compensation benefits.

All parties sought summary judgment, at least in part. Reliance argued, through a traditional summary judgment motion (and an amended motion), that it could not be liable for negligence or gross negligence because as Delta Steel's parent company at the time of Little's death, it was a distinct legal entity from Delta Steel, it did not have a duty to control Delta Steel's day-to-day operations and did not in fact do so, it did not owe any duty of care to Little, and only Delta

---

[2]In the trial court, appellees contended that Little's death could have been caused by the steel plate dislodging from the magnet after hitting an object, which was an "event that would not have been avoided through the use of a battery backup unit." The issues raised by the parties in this appeal do not require us to express an opinion concerning the cause of the dislodging of the steel plate from the crane that Little was operating when he died.

Steel could have owed such a duty. Reliance asserted that it had not hired, supervised, or trained Little and had not exercised sufficient control of Delta Steel's safety policies to create a duty toward Little. Reliance also argued, through a no-evidence motion for summary judgment, that even if appellants could produce evidence establishing a duty by Reliance to Little, appellants could not produce evidence that raised a genuine issue of material fact that Reliance was grossly negligent in breaching any duty.

In its October 2011 motion for partial summary judgment, Delta Steel contended that it was covered by workers' compensation insurance when Little died and that it therefore could not be liable under appellants' ordinary negligence claim because section 408.001(a) of the labor code[3] precluded the claim. In an effort to prove this assertion, Delta Steel attached, among other documents, a lengthy insurance policy issued by the Zurich-American Insurance Group (Zurich). The Zurich policy, which was effective for one year beginning September 1, 2008, designated Reliance as the "Named Insured," and although the policy contained a schedule of insureds and locations that named several other companies, the schedule did not name Delta Steel.[4] However, the policy listed an entity described as "Delta" in a workers' compensation classification schedule, and the policy appeared to calculate premiums for various groups of

---

[3]*See* Tex. Labor Code Ann. § 408.001(a) (West 2006).

[4]The schedule listed companies bearing Reliance's name and companies not containing "Reliance."

employees for "Delta." The documents attached by Delta to its motion for partial summary judgment also included an endorsement to the Zurich policy issued in May 2010 (after Little's death), which stated that it was agreed that Delta Steel had been "added to th[e] policy effective at its inception" on September 1, 2008.[5]

Delta Steel later filed an amended and supplemented motion for partial summary judgment. In that motion, Delta Steel expressly incorporated the October 2011 motion, repeated its argument concerning section 408.001 of the labor code, and additionally contended that appellants were estopped from pursing their ordinary negligence claim through Mary's acceptance of workers' compensation benefits.

Appellants sought summary judgment against appellees' statutory exclusive remedy affirmative defense, asserting that appellees could not produce any evidence supporting the defense. In their motion for summary judgment, appellants conceded that Mary had received workers' compensation benefits, but they alleged that the benefits had been paid under the Zurich policy that covered only Reliance. As summary judgment evidence, appellants produced, among other documents, printouts from a governmental website showing that a search of the website did not return Delta Steel as a company covered by workers'

---

[5]Along with the endorsement, Zurich issued a letter to a representative at Marsh Risk & Insurance Services (Marsh), which was the producer of the Zurich policy. The letter stated in part, "Enclosed please find . . . your copy of endorsement #6, adding Delta Steel, Inc. on the above policy effective at inception." The summary judgment evidence establishes that Zurich issued the endorsement upon Marsh's request.

compensation insurance. Thus, stemming from broad contentions that parent and subsidiary corporations are distinct legal entities, that Reliance had not exercised control over Little's work at Delta Steel, that Little's work had not furthered Reliance's business, and that coverage for a related entity is insufficient for an employer to claim the benefit of section 408.001, appellants argued that Delta Steel could not benefit from the exclusive remedy defense because it was not explicitly covered under a workers' compensation policy at the time of Little's death and that Reliance could not succeed on the defense because it had not employed Little.

Appellants also responded to Reliance's traditional summary judgment motion and filed a motion for summary judgment on their negligent undertaking claim against Reliance, contending that the summary judgment evidence conclusively proved that Reliance had undertaken a duty "to perform services that it knew or should have known were necessary for the protection of [Delta Steel's] warehouse employees"; that Reliance, through various acts or failures to act, had breached that duty; and that Reliance was also grossly negligent because although it knew of Delta Steel's "poor safety rating," it had chosen not to audit Delta Steel's Fort Worth plant. Reliance responded to appellants' motion for summary judgment on their negligent undertaking claim by asserting, in part, that appellants had not proved any affirmative act establishing an undertaking of a duty toward Little.

The trial court denied appellants' motions for summary judgment, granted appellees' motions for summary judgment, and overruled objections that appellants had asserted concerning Delta Steel's summary judgment evidence. Appellants asked the trial court to reconsider its decision to grant summary judgment for Delta Steel, contending in part that Delta Steel's estoppel and election of remedies affirmative defenses (as distinguished from its statutory exclusive remedy affirmative defense) had not been timely and properly pled.[6] Appellants also contended that Mary's acceptance of workers' compensation benefits could not bar appellants' claims under estoppel or election of remedies theories because she did not have knowledge of all material facts concerning the acceptance of the benefits and had not made an informed choice to accept them.

The trial court declined to reconsider its decision granting summary judgment for appellees. The court eventually severed appellants' still-pending gross negligence claim against Delta Steel[7] from all of the other claims against Delta Steel and Reliance on which the trial court had granted summary judgment in appellees' favor. Appellants brought this appeal.

---

[6]On appeal, appellants have not raised a complaint about the timing of Delta Steel's pleading.

[7]The statutory exclusive remedy defense does not preclude claims based on an employer's gross negligence that causes an employee's death. Tex. Labor Code Ann. § 408.001(b); *Port Elevator-Brownsville, L.L.C. v. Casados*, 358 S.W.3d 238, 241 (Tex. 2012).

8

## Summary Judgment Standards

We review a trial court's summary judgment rulings de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010); *Foreman v. Whitty*, 392 S.W.3d 265, 270 (Tex. App.—San Antonio 2012, no pet.). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review the parties' summary judgment evidence and determine all questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *see Myrad Props., Inc. v. Lasalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). The reviewing court should render the judgment that the trial court should have rendered. *Mann Frankfort*, 289 S.W.3d at 848.

In a traditional summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Id.* We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether

9

reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005). The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

**The Trial Court's Decision to Grant Summary Judgment for Delta Steel**

In their first issue, appellants contend that the trial court erred by granting summary judgment for Delta Steel because Delta Steel failed to prove as a matter of law that it was covered by workers' compensation insurance at the time of Little's death (and was therefore protected by the application of the exclusive remedy provision in section 408.001(a)) or that Mary's acceptance of benefits under the Zurich policy barred appellants' negligence claim through the common law affirmative defenses of acceptance of benefits or election of remedies. In addition to asserting that the literal application of section 408.001(a) precludes appellants' negligence claims, Delta Steel contends that the trial court's summary judgment decision was appropriate because estoppel principles preclude appellants from asserting an ordinary negligence claim after Mary applied for and received workers' compensation benefits. Because the trial court did not specify the basis for its decision to grant summary judgment for Delta Steel, we must affirm the judgment if any ground that Delta Steel raised in the trial court is

10

meritorious. *Collier v. Allstate Cnty. Mut. Ins. Co.*, 64 S.W.3d 54, 58 (Tex. App.—

Fort Worth 2001, no pet.) (citing *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471,

473 (Tex. 1995)).

The labor code provides that recovery of workers' compensation benefits is

the "exclusive remedy of an employee covered by workers' compensation

insurance coverage or a legal beneficiary against the employer . . . for the death

of or a work-related injury sustained by the employee." Tex. Labor Code Ann.

§ 408.001(a); *see Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 (Tex.

2007) ("The Texas Workers' Compensation Act provides exclusive compensation

benefits for the work-related injuries of a subscribing employer's employees.").

As the supreme court has explained, section 408.001(a) specifically, along with

the labor code's provisions relating to workers' compensation benefits generally,

aids both

> employees and employers. For employees, the [labor code] allows
> them to recover workers' compensation benefits for injuries in the
> course and scope of employment without proving fault by the
> employer and without regard to their negligence or that of their
> coworkers. . . . For employers, their liability to employees is limited.

*Casados*, 358 S.W.3d at 241. To enjoy the liability protection offered by section

408.001(a), an employer must show that it was explicitly covered for workers'

compensation at the time of the employee's injury. *See Garza v. Exel Logistics,*

*Inc.*, 161 S.W.3d 473, 477–79 (Tex. 2005) (holding that workers' compensation

coverage for a temporary employment agency did not protect the agency's client

company under section 408.001(a) and that "employers cannot agree that one

11

workers' compensation policy will name only one employer but cover both");

*Warnke v. Nabors Drilling USA, L.P.*, 358 S.W.3d 338, 343 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g).

Although appellants contest whether the Zurich policy provided explicit coverage for Delta Steel, they concede that Delta Steel was Little's employer and that Mary received benefits under that policy. They contend, however, that Mary's receipt of benefits does not preclude them from suing Delta Steel for negligence because Mary "did not pursue the benefits but merely began receiving them, not knowing if Delta [Steel] was or was not a covered entity. . . . Thus, any election she made was not an informed one."

In the trial court and in this court, appellants have characterized Delta Steel's common law affirmative defense as quasi-estoppel. We have explained that quasi-estoppel is

> an affirmative defense that "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citation omitted); *see Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied) (explaining that "unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance"). *"Thus, quasi estoppel forbids a party from accepting the benefits of a transaction . . . and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." Atkinson Gas Co. v. Albrecht,* 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied).

12

*Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.) (emphasis added).

We have applied the quasi-estoppel affirmative defense in circumstances that are analogous to the facts of this case. For example, in *Lindley v. McKnight*, an estate had accepted money that corporations had paid for redemption of stock shares under the terms of shareholders' agreements but had nonetheless brought a suit, through an independent executor, to contest the enforceability of the shareholders' agreements and to claim that the corporations had violated them. 349 S.W.3d 113, 120–22, 130–33 (Tex. App.—Fort Worth 2011, no pet.). We held that the estate's acceptance of benefits precluded its pursuit of those claims, explaining in part,

> [The estate's] UDJA and breach of contract claims challenge either the validity of the shareholders' agreements or the actions that the corporations took under the agreements. But [the] estate accepted benefits that it could not have received if the agreements are not valid and were not complied with. . . . The record contains copies of checks . . . sent by the corporations to [the] estate and negotiated by [the independent executor].
>
> . . . The *only reason* that [the] estate could have been entitled to receive specific payments totaling $733,806.63 is the redemption of the stock under section five of the shareholders' agreements. . . . Throughout the course of this litigation, which began in 2000, [the independent executor] never returned the money that the corporations tendered to [the] estate. We conclude that it would be unconscionable to allow [the] estate to retain the benefit it received for the redemption of [the decedent's] shares while it concurrently challenges the provisions of the shareholders' agreements that made the redemption possible.

*Id.* at 131–32.

13

Similarly, in *Doe v. Texas Association of School Boards, Inc.*, we held that quasi-estoppel precluded a party who obtained money under a settlement agreement from contending that she did not have the authority to provide the consideration required to secure the money. 283 S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Brooks*, 257 S.W.3d at 423); *see also Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 607–08 (Tex. App.—Corpus Christi 2004, pets. denied) (stating that quasi-estoppel "essentially requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped" and holding that quasi-estoppel barred a party from challenging an agreement that it accepted benefits under); *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 81–83, 87–88 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that quasi-estoppel prevented a property inspection company from claiming that a plaintiff did not have standing to sue for a breach of an inspection contract when the company accepted the benefits of the contract and stated in an inspection report that noncontracting entities could rely on the report); *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 111 (Tex. App.—Houston [14th Dist.] 1996, no writ) ("Premier, a party which . . . availed itself of the benefits of the lease for over a year, may not challenge the validity of the [l]ease . . . .").

14

The evidence establishes that Carol Gallimore, a claims representative,[8] began handling Little's workers' compensation insurance claim on March 11, 2009 (which was the day that he died). Gallimore asked Zurich whether Delta Steel's Fort Worth plant had workers' compensation coverage, and she was told that coverage existed.[9] Upon being told that Delta Steel's Fort Worth plant had workers' compensation coverage, Gallimore began administering the claim.

For example, on March 26, 2009, Gallimore spoke with Mary's counsel regarding the claim, and on the same day, Mary signed a form concerning compensation benefits and faxed the form to Gallimore. The form listed Delta Steel as Little's employer, named Mary as the eligible beneficiary, expressed that Mary was claiming burial benefits and death benefits,[10] and stated, "Beneficiaries of an employee who died from an on-the-job injury or occupational disease must file this form with the Texas Department of Insurance, Division of Workers' Compensation (Division) . . . to protect your claim for entitlement to death benefits." During the process of Gallimore's administration of the workers'

---

[8]Gallimore works for ESIS. ESIS is a third-party administrator, meaning that it assesses and resolves insurance claims for employers and insurance carriers.

[9]Gallimore, who explained that she had seen insurance policies that simultaneously covered parent corporations and their subsidiaries, confirmed that she "relied totally" on what Zurich told her about coverage; she did not, near the time of Little's death, review Zurich's policy.

[10]The record establishes that Gallimore informed a funeral home that Little's funeral-related expenses would be paid under the Zurich policy.

compensation claim, Mary "produced evidence" of Little's death, and either Mary or her counsel verified Little's scope of employment with Delta Steel.

On March 27, 2009, Gallimore prepared a document titled "NOTIFICATION OF FIRST DEATH BENEFIT PAYMENT." The notification, which was addressed to Mary, stated that through the Zurich policy, Mary would begin receiving weekly death benefits in the amount of $597.40. The notification, which listed Reliance as Little's employer, also informed Mary to contact Gallimore if she did not agree with the amount of the benefit.

After receiving benefits for a couple of months, in June 2009, Mary, after suing Delta Steel, applied with the Texas Workers' Compensation Commission to change her benefits from weekly to monthly payments through the purchase of an annuity with the Metropolitan Life Insurance Company (MetLife). The form for the application listed Delta Steel as Little's employer, designated Zurich as the insurance carrier, and expressed that Mary would begin receiving a monthly death benefit of $2,597.62 through the annuity. Mary, her counsel, and Gallimore signed the form. Zurich and MetLife executed a reinsurance agreement concerning the annuity; the agreement expressed that Mary would receive "$2,597.62 for life, payable monthly beginning" on July 1, 2009.

Despite this evidence that conclusively proves Mary's application for and receipt of workers' compensation benefits on account of Little's death that occurred during his employment with Delta Steel, appellants contend that quasi-estoppel does not preclude them from inconsistently contesting Delta Steel's

16

workers' compensation coverage because Mary did not make an informed choice between two inconsistent positions and because she was misled "as to the party that was responsible for paying the benefits." We have explained that there can be no "estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts." *Clark*, 327 S.W.3d at 770 (quoting *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971)). But even if Mary did not have knowledge of the effect of accepting workers' compensation benefits on her negligence claim against Delta Steel in the early part of 2009 or if she accepted them at that time only because she assumed, based on representations made to her, that Delta Steel was covered under the Zurich policy, the evidence provides reasons for us to conclude that Mary later had knowledge of the material facts related to her acceptance of benefits while she continued to accept them. *Cf. Lindley*, 349 S.W.3d at 133 (holding that quasi-estoppel applied because even if "there was some point in the past when [the decedent] did not know" of stock transfer restrictions, the decedent's estate "accepted the benefit in question . . . at a time that it knew all facts regarding the distribution of that benefit and the actual rejection of the transfer").

First, in responding to Delta Steel's motion for summary judgment, Mary filed an affidavit in which her counsel conceded that in June 2009 (before Mary's weekly payments were officially converted to monthly payments through the annuity), Delta Steel answered appellants' lawsuit by "asserting that [appellants'] claims [were] barred by an exclusive-remedy provision of the Texas Workers'

17

Compensation Act."[11]  Next, appellants admitted in the trial court, through their counsel's affidavit, that in December 2009, Delta Steel provided the Zurich policy to them.

Therefore, it cannot be disputed that by December 2009, appellants had the Zurich policy, knew that Delta Steel was claiming to be insured under it, knew that Delta Steel was asserting the benefit of the exclusive remedy defense under section 408.001(a), and had the ability to ascertain whether the policy provided coverage.[12]  Nonetheless, at a deposition in January 2012, which was more than two years later, Gallimore testified that Mary was still receiving workers' compensation benefits through the annuity.[13]  No evidence exists that at any

---

[11]Specifically, Delta Steel's original answer stated in part,

Defendant specially excepts to Plaintiffs' allegations concerning negligence, as they are strictly prohibited by the Texas Labor Code. More specifically, [section 408.001(a)] states that . . . "recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." . . . Defendant requests that the Court sustain this special exception and order the Plaintiffs to replead their petition and remove any causes of action pertaining to negligence . . . .

[12]Appellants argue that any coverage determination was discernable from the four corners of the policy.

[13]Appellants did not produce evidence in the trial court to contradict Gallimore's deposition testimony that Mary was still receiving benefits through the annuity in January 2012.  By January 2012, although Mary was receiving benefits, appellants had filed a motion for summary judgment on Delta Steel's exclusive remedy defense, claiming that no evidence existed to show that Delta Steel had coverage.

18

point after December 2009, Mary attempted to reject further workers' compensation benefits based on an assertion that they were not being properly paid under the Zurich policy. Thus, we hold that Mary accepted benefits while knowing all material facts associated with doing so. *See Clark*, 327 S.W.3d at 770; *see also Medina v. Herrera*, 927 S.W.2d 597, 603 (Tex. 1996) (concluding that a plaintiff who had accepted workers' compensation benefits had made an "informed" election when the plaintiff had been represented by counsel in submitting his claim for benefits and had been receiving benefits for two years when he filed his lawsuit).

We note that like in *Lindley*, where the only reason that an estate could have been entitled to receive benefits was the redemption of stock under shareholders' agreements that the estate challenged, the only reason that Mary could have been entitled to receive workers' compensation benefits was through insurance coverage of Delta Steel, which was indisputably Little's employer. The Texas Workers' Compensation Act defines "[b]enefit" as a "medical benefit, an income benefit, a death benefit, or a burial benefit based on a *compensable injury*." Tex. Labor Code Ann. § 401.011(5) (West Supp. 2012) (emphasis added). A "[c]ompensable injury" is an injury that "arises out of and in the *course and scope of employment for which compensation is payable*." *Id.* § 401.011(10) (emphasis added). The "[c]ourse and scope of employment" means an "activity of any kind or character that has to do with and originates in the *work, business, trade, or profession of the employer and that is performed by an employee*." *Id.*

19

§ 401.011(12). Death benefits are payable to a legal beneficiary only when a "compensable injury *to the employee* results in death." *Id.* § 408.181(a) (West 2006) (emphasis added).

Appellants cite two supreme court decisions to propose that a "claimant's receipt of benefits does not render the exclusive remedy provision applicable to the decedent's employer." These cases are distinguishable, however, because they each concerned whether more than one entity could qualify as a plaintiff's employer and could establish workers' compensation insurance coverage, which is not the issue in this case. *See Garza*, 161 S.W.3d at 474–78; *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 134–35 (Tex. 2003). Neither case concerned the factual scenario of this case: a party's acceptance of workers' compensation benefits that is inconsistent with the party's claim that no employer had workers' compensation coverage.

Finally, appellants contend that even if Mary's acceptance of benefits estops her from pursing a negligence claim against Delta Steel, the acceptance of benefits should not estop the other appellants because each of them "have their own independent" wrongful death claims. For two reasons, we disagree.

First, the Texas wrongful death statute applies only if "the individual injured would have been entitled to bring an action for the injury if the individual had lived." Tex. Civ. Prac. & Rem. Code Ann. § 71.003(a) (West 2008); *see Verdeur v. King Hospitality Corp.*, 872 S.W.2d 300, 301 (Tex. App.—Fort Worth 1994, writ denied) (explaining that negligence claims under the wrongful death or survival

20

statutes are derivative of the decedent's rights). In applying for benefits, Mary represented that she was Little's legal beneficiary. In a wrongful death suit, the decedent's beneficiaries represent the decedent and act on the decedent's behalf. *See Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992); *Washam v. Hughes*, 638 S.W.2d 646, 648 (Tex. App.—Austin 1982, writ ref'd n.r.e.); *see also In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) (orig. proceeding) (stating that it "is well established that statutory wrongful death beneficiaries' claims place them in the exact 'legal shoes' of the decedent"). Thus, we conclude that Mary represented Little when she accepted benefits that were paid in conjunction with his employment, that her acceptance of benefits would have precluded him from suing Delta Steel for negligence had he lived, and that her acceptance of benefits therefore precludes the other appellants from bringing a derivative negligence claim on Little's behalf*. See Simpson v. State*, 998 S.W.2d 304, 307 (Tex. App.—Austin 1999, pet. denied) ("Because we have concluded that Simpson's claims are barred under section 408.001, so too is her son's loss of consortium claim.").

Second, workers' compensation benefits are intended to be a complete and adequate substitute for bringing claims under common law; as the supreme court has explained,

> To recover damages at common law, an injured worker was required not only to establish that the employer's negligence proximately caused the injury, but also to avoid the defenses of contributory negligence, assumption of the risk, and fellow servant. . . .

21

In comparison, the Act . . . provides benefits to injured workers without the necessity of proving negligence and without regard to the employer's potential defenses. In exchange, the benefits are more limited than the actual damages recoverable at common law. We believe *this quid pro quo, which produces a more limited but more certain recovery, renders the Act an adequate substitute* . . . .

*Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 521 (Tex. 1995) (emphasis added); *see Holmans v. Transource Polymers, Inc.*, 914 S.W.2d 189, 193 (Tex. App.—Fort Worth 1995, writ denied) (explaining that the "Workers' Compensation Act is an example of the legislature's reasonable substitute for common-law rights") (footnote omitted). Thus, in light of Mary's acceptance of death benefits[14] with knowledge of the material facts associated with doing so, we conclude that the survival of a negligence claim by other appellants would be repugnant to the purpose of the workers' compensation statute. *See Medina*, 927 S.W.2d at 603 (holding that the pursuit and receipt of workers' compensation benefits was "fundamentally inconsistent" with a common law claim).

For all of these reasons, we hold that the evidence proves, as a matter of law, that quasi-estoppel applies because it is unconscionable for appellants to assert a right (the ability to sue Delta Steel for negligence) that is inconsistent with a position previously taken (Mary's application for workers' compensation benefits and her acceptance of the benefits over a course of more than two

---

[14]*See* Tex. Labor Code Ann. § 408.182 (West Supp. 2012) (providing for varying distributions of death benefits to relatives of the decedent depending on the age and status of the relatives and upon which relatives survive the decedent). None of the appellants other than Mary have asserted that they could have been statutorily entitled to receive death benefits.

22

years). *See Lindley*, 349 S.W.3d at 130–33; *Clark*, 327 S.W.3d at 770; *see also Berry v. Gregg Indus. Servs., Inc.*, 907 S.W.2d 4, 5 (Tex. App.—Tyler 1994, writ denied) ("[B]y claiming and collecting [workers' compensation] benefits, Berry is precluded from maintaining an action at common law against his employer or fellow employees."); *LeJeune v. Gulf States Utils. Co.*, 410 S.W.2d 44, 47–48 (Tex. Civ. App.—Beaumont 1966, writ ref'd n.r.e.) ("Appellant sought and obtained this award of [workers'] compensation . . . and received and accepted the benefits thereof. Appellant cannot be heard to . . . attempt to recover actual damages on the ground that Gulf States Utilities Company was not a subscriber under the Act."); *Heibel v. Bermann*, 407 S.W.2d 945, 946 (Tex. Civ. App.—Houston 1966, no writ) ("We are of the view that appellants, by proceeding to claim and collect benefits provided under the workmen's compensation policy of insurance provided by the employer, . . . are as a matter of law precluded from maintaining an action at common law for damages . . . ."). Thus, we hold that the trial court did not err by granting summary judgment for Delta Steel on the ground that Mary's application for and acceptance of workers' compensation benefits estopped appellants from denying Delta Steel's workers' compensation coverage, from contesting the applicability of the exclusive remedy provision of section 408.001(a), and from pursuing a negligence claim against Delta Steel. *See Mann Frankfort*, 289 S.W.3d at 848. Because our holding on Delta Steel's acceptance of benefits defense is dispositive of the trial court's decision to grant

23

summary judgment for Delta Steel and to deny appellants' motion for summary judgment with respect to Delta Steel, we overrule appellants' first issue.[15]

**The Trial Court's Decision to Grant Summary Judgment for Reliance**

In their second issue, appellants contend that the trial court erred by granting summary judgment for Reliance on appellants' negligence and gross negligence claims. On appellants' ordinary negligence claim, Reliance sought summary judgment solely on the basis that as Delta Steel's parent company, it did not owe a duty to Little. Appellants contended in the trial court that Reliance was liable for its own negligence (as distinguished from being vicariously liable for Delta Steel's acts)[16] because it failed to provide a reasonably safe workplace for Delta Steel's employees after assuming responsibility to do so, failed to require Delta Steel to provide safe production equipment, failed to require Delta Steel to properly supervise its managers so that the managers would provide a

---

[15]Thus, we decline to address the other contentions contained in appellant's first issue, including whether the explicit terms of the original Zurich policy or the endorsement to the policy contractually provided coverage for Delta Steel. *See* Tex. R. App. P. 47.1; *City of Haltom City v. Aurell*, 380 S.W.3d 839, 859 n.17 (Tex. App.—Fort Worth 2012, no pet.). We note that although appellants complain about the trial court's evidentiary rulings in their first issue, they limit their arguments to challenge deposition excerpts and affidavits as proof of coverage because the affidavits and excerpts were based on hearsay, were not based on personal knowledge, and were conclusory. Because we are not addressing the issue of coverage beyond concluding that appellants are estopped from denying it, we need not opine on whether the opinions about coverage were admissible.

[16]Thus, much of Reliance's argument in this court and in the trial court, which concerns whether Reliance could be vicariously liable for Delta Steel's torts, if any, is inapposite.

24

safe workplace, failed to require Delta Steel to properly train its employees about the safe operation of electromagnetic lifting devices, and failed to require Delta Steel to implement and enforce policies and procedures regarding the safe operation of production equipment.

To prove a negligence claim, a plaintiff must establish the existence of a legal duty, breach of that duty, and damages proximately caused from the breach. *Morris v. Scotsman Indus., Inc.*, 106 S.W.3d 751, 754 (Tex. App.—Fort Worth 2003, no pet.). The existence of a duty is a threshold question of law, and the "nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Id.*

As explained in *Morris*, in which the issue was whether a parent company owed a duty to an employee who was injured while working for a subsidiary,

> The Texas Supreme Court has held that in cases where a plaintiff alleges negligence in maintaining a safe workplace, the plaintiff must show that the party it asserts had a duty to provide a safe workplace had actual control or a right of control over the *specific* aspect of the safety and security of the premises that led to the plaintiff's injury. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); *Brooks v. Nat'l Convenience Stores, Inc.*, 897 S.W.2d 898, 902–03 (Tex. App.—San Antonio 1995, writ denied). A court cannot infer duty from evidence showing actual control or a right of control over the general operation of the workplace. *Exxon*, 867 S.W.2d at 23. . . . [O]nly corporations that have the right to control or actually control safety and security policies of the workplace have a duty to the workers to maintain a safe workplace. *Id.*; *Brooks*, 897 S.W.2d at 903.

*Id.*; *see Exxon*, 867 S.W.2d at 23 ("We consider . . . the nature of the matters to which the right of control extends to be determinative. We think that in a case

25

alleging negligence in maintaining a safe workplace, the court's inquiry must focus on who had specific control over the safety and security of the premises . . . .").

The parties agree that parent corporations generally have no duty to control their subsidiaries. Citing section 324A of the Restatement (Second) of Torts, however, appellants contend that Reliance voluntarily undertook a duty to keep Delta Steel's employees safe. Section 324A states, in part, that one who undertakes to render services to another which he should recognize as necessary for the protection of a third person is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care in completing the undertaking if he has undertaken to perform a duty owed by the other to the third person. Restatement (Second) of Torts § 324A(b) (1965); *see Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) ("[W]e have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation."); *see also Olivas v. Sw. Royalties Holdings, Inc.*, No. 08-02-00090-CV, 2003 WL 21919593, at *3 (Tex. App.—El Paso Aug. 12, 2003, pet. denied) (mem. op.) (stating that Texas courts have "recognized . . . a theory of liability" under section 324A).

In *Abdel-Fattah v. Pepsico, Inc.*, a court of appeals explained that cases that have extended liability under section 324A to parent corporations for injuries to subsidiaries' employees have

26

involved incidents where the parent corporation had engaged in an undertaking which *directly* promoted the interests of its subsidiary in providing a safe workplace. *See Johnson v. Abbe Engineering*, 749 F.2d 1131, 1132–33 (5th Cir. 1984) (interpreting Texas law)[17] . . . . For instance, in *Johnson*, the court found a parent corporation had undertaken the duty of performing safety inspections at its subsidiary's plant. 749 F.2d at 1132–33. When an explosion occurred, injuring several of the subsidiary's employees, the parent corporation was found liable under a [section] 324A theory. *Id.* Due to the inspections, management at the subsidiary corporation was lulled into a false sense of security that the plant was safe and any injuries suffered as a direct result of the negligent inspection were logically imposed on the parent corporation which undertook such inspections. *Id.* at 1133.

Significantly, in *Johnson*, the court found that a duty existed only because the defendant had either "undertaken to inspect *the specific instrument* causing the injury or to inspect *the entire plant* of which that instrument was a part."

948 S.W.2d 381, 385–86 (Tex. App.—Houston [14th Dist.] 1997, no writ); *see also Muniz v. Nat'l Can Corp.*, 737 F.2d 145, 148 (1st Cir. 1984) (stating that a parent corporation may be liable for a subsidiary's unsafe conditions if the parent company undertakes, contractually or through conduct, to provide safe working conditions at the subsidiary); *Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1131 (La. 2004) (explaining that in determining whether a parent corporation affirmatively undertook the duty of safety owed by its subsidiary, "courts have

---

[17]We may rely on federal decisions and decisions from other states as persuasive authority. *See City of Carrollton v. Singer*, 232 S.W.3d 790, 797 n.6 (Tex. App.—Fort Worth 2007, pet. denied); *SpawGlass Const. Corp. v. City of Houston*, 974 S.W.2d 876, 881 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

looked to the scope of the parent's involvement, the extent of the parent's authority, and the underlying intent of the parent").

The Dallas Court of Appeals applied the principles of section 324A in *Seay v. Travelers Indem. Co.*, 730 S.W.2d 774, 776 (Tex. App.—Dallas 1987, no writ). In *Seay*, a hospital's maintenance employee had been working near a boiler when a safety release valve on the boiler malfunctioned and discharged scalding water onto the employee. *Id.* at 775. After the employee died, his wife and children sued an insurance company on the ground that the company had negligently inspected the boiler owned by its insured. *Id.* Although the insurance company argued that it did not owe a duty to the employee, the court of appeals disagreed, citing section 324A and stating that the insurance company had performed acts that had directly promoted the interests of its insured "in the safety of [the insured's] boilers and thereby was undertaking to render services to [the insured]." *Id.* at 778–79; *cf. Coastal Corp. v. Torres*, 133 S.W.3d 776, 780–81 (Tex. App.—Corpus Christi 2004, pet. denied) (concluding that complaints about a parent company's refusal to budget expenditures for a subsidiary was the "antithesis of an affirmative course of action" that was required to prove the voluntary undertaking of a duty to provide safety to the subsidiary's employees).

Similarly, in *Shelby v. Granbury Care Ctr.*, Shelby, who was an employee of a company that provided nursing services, was injured at Granbury Care Center (Granbury), where the services were to be provided, after an employee of Granbury refused to help Shelby transfer a patient who weighed over three

28

hundred pounds from his bed to his wheelchair. No. 10-05-00063-CV, 2006 WL 1041993, at *1 (Tex. App.—Waco Apr. 12, 2006, pet. denied) (mem. op.). Shelby sued Granbury, and Granbury sought summary judgment on the ground that it had not owed a duty to Shelby. *Id.* In reversing a trial court's decision to grant summary judgment for Granbury, the Waco Court of Appeals cited section 324A and stated,

> There is uncontroverted evidence that, prior to the incident in which Shelby was injured, Granbury employees always assisted Shelby in transferring patients from their beds to their wheelchairs. There is also evidence that it was commonly understood by Granbury employees that they must assist [employees of the company providing nursing services] in transferring patients out of bed. Even if Granbury ordinarily would not have had a duty to assist . . . employees in transferring patients, it arguably assumed such a duty by consistently assisting . . . employees in the past.

*Id.* at *4.

The evidence presented by the parties in the trial court established that Reliance acquired the outstanding stock of Delta Steel's direct parent company in early August 2008 and that through a series of mergers, Reliance eventually became the direct parent company of Delta Steel.[18] According to Steve Milanoski, who is a regional safety compliance specialist with Reliance, Reliance audits subsidiaries' plants "for compliance [with] the Reliance safety standards,

---

[18]Reliance, through one of its subsidiaries, bought all of the outstanding capital stock of PNA Group, Inc. for a price of over $300 million. PNA Group, Inc., which merged with Reliance (with Reliance surviving the merger), had owned Delta Steel. Reliance became Delta Steel's immediate parent company in March 2011, after Little's death. Reliance buys, sells, and distributes metal but does not manufacture it.

[which are set out in a] policy and procedures manual." Milanoski testified in a deposition that Reliance expects all subsidiaries to comply with the terms of the manual and that Reliance also shares safety inspection forms with its subsidiaries. Milanoski also explained that Reliance required subsidiaries to "document shift[-]wise inspection" of certain equipment. In fact, Milanoski said that when he audits one of Reliance's subsidiaries, the "first thing [he looks] for" is documented evidence of regular inspections of equipment, including cranes.

Milanoski described the audits that he conducts of subsidiaries as "one-day event[s]," explaining that he looks for documented evidence of inspections but, for example, relies on independent crane maintenance companies that subsidiaries have contracted with to actually perform the inspections. Milanoski stated that Reliance "insist[s] that each subsidiary contract with a crane inspection service"[19] and expects cranes to be inspected "at least annually." According to Milanoski, if a crane inspector made a recommendation that one of Reliance's subsidiaries did not implement, Reliance would counsel the subsidiary to make "immediate plans to rectify the situation . . . or to take the crane out of service." Milanoski indicated that Reliance would direct a subsidiary to take a crane out of operation if the crane was going to imminently fail, but he

---

[19]Milanoski's testimony established that Reliance mandates its subsidiaries to subcontract out crane inspections because "most of [Reliance's] subsidiaries aren't large enough to keep that expertise in-house."

30

nonetheless opined that the subsidiary is "responsible for the safe operation of [its] equipment."

One of Milanoski's primary purposes as a safety compliance specialist is to ensure subsidiaries' compliance with Reliance's policies. During audits, Milanoski inspects the facilities of Reliance's subsidiaries for cleanliness and wear and tear on equipment.

Although Milanoski stated that he has the authority to audit one of Reliance's subsidiaries at any time and recognized that Reliance could have audited Delta Steel's Fort Worth plant any time after August 2008, he testified that he had never audited the Fort Worth plant.[20] Delta Steel's Houston and San Antonio plants, however, were audited by Milanoski in the first quarter of 2010.

Tom Graham, who is Delta Steel's vice president of operations and who has served as the company's safety director since the 1980s, testified in a deposition that he trains Delta Steel's warehouse managers, oversees monthly reporting of their safety meetings, inspects Delta Steel's facilities annually, and leads an annual meeting of warehouse managers. Concerning his communication with Reliance, Graham testified that shortly after Reliance acquired Delta Steel in 2008, Reliance sent its safety manual to Delta Steel and

---

[20]Milanoski's job requires him to monitor safety compliance for sixty facilities owned by Reliance's subsidiaries, four of which are owned by Delta Steel. Milanoski traveled to Delta Steel's Fort Worth location after Little's death to offer condolences to workers at the plant. At that time, he learned that the crane that Little was using when he died did not have a battery backup unit.

31

expressed that it expected Delta Steel's safety manual to, at a minimum, contain everything that Reliance's safety manual included.[21] Graham explained that since the time of Reliance's acquisition of Delta Steel, Delta Steel had "follow[ed] the bare minimum [of] Reliance['s] safety manual." Graham, who worked with Milanosky on Delta Steel's safety-related issues, said that Reliance also required Delta Steel to mail monthly reports on accidents and investigations to Reliance and that Reliance had the "right" to confront Delta Steel about safety issues.

Michael Kruse, Reliance's director of safety and quality control,[22] testified in a deposition that verbally and in writing, he communicates his expectation to Reliance's subsidiaries that Reliance expects them to follow certain safety practices and to protect their workers. Kruse also confirmed, more specifically, that he expects Delta Steel to meet Reliance's safety standards and that he has communicated that expectation to Graham. According to Kruse, Reliance's subsidiaries should be run, at least as it concerns safety, just as Reliance would be run; Kruse testified that subsidiaries should be operated as if they had Reliance's name on their "exterior signage."

Kruse explained that when Reliance conducts a safety audit of a subsidiary's facility, Reliance analyzes whether the facility is operating within

---

[21]Reliance allows subsidiaries to implement additional policies that are not inconsistent with Reliance's policies.

[22]Milanoski is subordinate to Kruse; thus, Milanoski sends reports of the safety audits that he conducts to Kruse.

Reliance's safety standards and expects that any deviation found between Reliance's safety standards and the facility's safety standards will be corrected by the facility. Kruse conceded that the "same rules and regulations" apply to Reliance and Reliance's subsidiaries.

Kruse testified that Reliance does not monitor logs related to its subsidiaries' employees, does not train equipment operators for the subsidiaries, does not train management of the subsidiaries about how to oversee the day-to-day operations of their organizations, does not generally provide forms to be used in training, does not require subsidiaries to provide training documentation for their employees, does not direct subsidiaries to choose a particular method of transporting steel, does not maintain files on subsidiaries' employees, and does not determine subsidiaries' equipment needs. Kruse confirmed, however, that Reliance requires its subsidiaries to send monthly reports to Reliance about man-hours worked and work-related injuries at the subsidiaries' plants. Also, Kruse testified that if Reliance made a safety recommendation that a subsidiary's facility did not follow, he would discuss the matter with the subsidiary's president, and "if that wasn't sufficient, then [Kruse] would escalate" the matter.

Kruse attended a meeting of Delta Steel's warehouse managers in November 2008 (shortly after Reliance acquired Delta Steel) in Houston and spoke to the group about several aspects of Reliance's safety program and about Reliance's safety expectations. At the meeting, Delta Steel gave Kruse a copy of Delta Steel's updated manual so that Kruse would "know what [Delta Steel] had

33

changed" in the manual. Graham has acknowledged that Kruse is his "superior" with regard to Delta Steel's safety issues.

We hold that this evidence establishes that under section 324A and the cases cited above, Reliance voluntarily undertook the duty owed by Delta Steel to provide safety to Little.[23] Specifically, we conclude that this duty arose because Reliance generally controlled aspects of Delta Steel's safety policies (through, among other acts, commanding the inclusion of certain provisions in Delta Steel's manual); specifically controlled policies concerning the inspection of cranes (such as requiring Delta Steel to hire an independent inspection company); had the authority to audit Delta Steel's Fort Worth plant and to require Delta Steel to correct safety issues discovered upon an audit; audited Delta Steel's other plants; had the authority to require Delta Steel to take a malfunctioning crane out of service; and required Delta Steel to mail monthly reports on accidents and investigations to Reliance. *See* Restatement (Second) of Torts § 324A; *Morris*, 106 S.W.3d at 754; *Abdel-Fattah*, 948 S.W.2d at 385–86; *Seay*, 730 S.W.2d at 778–79. In other words, we hold that Reliance undertook a duty under section 324A because although the evidence demonstrates that Reliance does not regulate all aspects of Delta Steel's

---

[23]Delta Steel, as Little's employer, had a "duty to use ordinary care in providing a safe work place." *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996).

34

business, it establishes that Reliance asserts that it has the controlling, primary authority for maintaining safety at Delta Steel's facilities.

For the proposition that corporate "supervision or oversight does not translate into an involvement of the day-to-day affairs of a subsidiary, and therefore fails to create an independent duty to the [subsidiary's] employees," appellees cite *White v. Elcor Corp.*, No. 09-99-00381-CV, 2001 WL 359833 (Tex. App.—Beaumont Apr. 12, 2001, no pet.) (not designated for publication). That case is distinguishable.

In *White*, the parent company had the authority to compel the subsidiary to "adopt particular safety policies," but there is no indication that the parent company actually did so. *Id.* at *1. The parent company's vice president of administration was aware that the subsidiary had a safety policy and had read "a part of it," but the vice president had "no direct responsibility or control" over the subsidiary's safety procedures. *Id.* Finally, while the vice president "was authorized to discuss safety problems with [the subsidiary's] management[,] he did not have authority to approve responses to those problems; that responsibility [remained] with [the subsidiary's] management." *Id.* at *2. Under these facts, the Beaumont Court of Appeals held that the parent company had not undertaken a duty to provide safety for the subsidiary's employees under section 324A. *Id.* at *2–3.

Similarly, in *Cleveland Regional Medical Center, L.P. v. Celtic Properties, L.C.*, which appellees also cite, the parent company was not involved in the

35

subsidiary's day-to-day operations, the subsidiary was responsible for maintenance and repairs, and the parent company "merely approved certain requests for capital expenditures."  323 S.W.3d 322, 351 (Tex. App.—Beaumont 2010, pet. denied).  Thus, the court of appeals held that the parent company did not owe a duty with respect to the subsidiary's premises.  *Id.*

The facts described above concerning the relationship between Reliance and Delta Steel involve a much greater level of parent-company control over safety than the control that existed in *White* or in *Cleveland Regional Medical Center, L.P.*

Finally, Reliance contends that to establish a duty under section 324A, appellants were required to prove that Reliance "overtook the responsibilities of Delta Steel to perform a duty owed by Delta Steel to Little *such that Delta Steel no longer bore the responsibility.*"  [Emphasis added.]  But Reliance has not cited authority supporting such a restrictive application of section 324A(b), and we have not located any Texas cases supporting such an application.  We conclude that section 324A(b) applies in this case because even if Reliance did not completely supplant Delta Steel's duty to provide safety to Little, the evidence establishes that Reliance went beyond merely supplementing that duty because it assumed the primary responsibility for Delta Steel's workplace safety.  *Cf. Miller v. Bristol-Myers Co.*, 168 Wis.2d 863, 886, 485 N.W.2d 31, 39 (1992) (deciding that it would be "inequitable to provide immunity to a parent corporation that had assumed a duty of care to its subsidiary's employees and whose

36

unreasonable performance of its undertaking was a cause of the injuries, simply because its activities were supplemental to, rather than in lieu of, the subsidiary's practices").[24]

For all of these reasons, we conclude that the trial court erred by granting summary judgment for Reliance on appellants' ordinary negligence claim, which is premised on Reliance's voluntary undertaking of a duty.[25]  Accordingly, we sustain part of appellants' second issue.

In the trial court, Reliance sought summary judgment on appellants' gross negligence claim on two independent grounds:  Reliance did not owe a duty to Little, and appellants could not produce more than a scintilla of evidence that Reliance was grossly negligent.  *See LaRue v. Chief Oil & Gas, L.L.C.*, 167 S.W.3d 866, 879 (Tex. App.—Fort Worth 2005, no pet.) (discussing the elements of gross negligence).  The trial court granted Reliance's motion without specifying the reason for doing so.  On appeal, appellants have not challenged the merits of Reliance's no-evidence motion for summary judgment on appellants' gross negligence claim.  Thus, we must affirm the trial court's decision to grant summary judgment as to that claim, and we overrule appellants' second issue to

---

[24]We note that section 324A's standards have been substantially incorporated into the most recent Restatement on torts.  *See* Restatement (Third) of Torts:  Physical & Emotional Harm § 43 (2012).  A comment in the new Restatement states, "The actor who engages in an undertaking need not completely displace the person originally owing the duty.").  *Id.* cmt. g.

[25]We do not express an opinion about whether appellants may meet the other elements of their negligence claim against Reliance.

37

that extent.  *See Collier*, 64 S.W.3d at 58; *Torres v. Johnson*, 91 S.W.3d 905, 908 n.3 (Tex. App.—Fort Worth 2002, no pet.) (affirming a summary judgment on an unchallenged ground).

## Conclusion

Having overruled appellants' first issue and part of their second issue, we affirm the part of the trial court's judgment that grants summary judgment for Delta Steel on appellants' ordinary negligence claim and grants summary judgment for Reliance on appellants' gross negligence claim.  However, having sustained the remaining part of appellants' second issue, we reverse the part of the trial court's judgment that grants summary judgment for Reliance on appellants' negligence claim, and we remand this case to the trial court for further proceedings regarding that claim.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED:  July 11, 2013