**NIAGARA FIRE INSURANCE COMPANY et al., Appellants,**

v.

**NUMISMATIC COMPANY OF FORT WORTH et al., Appellees.**

No. 16532.

Court of Civil Appeals of Texas.

Fort Worth.

June 26, 1964.

Rehearing Denied July 17, 1964.

Pannell, Dean, Pannell & Kerry, Fort Worth, Eastham, Watson, Dale & Forney, and J. P. Forney, Jr., Houston, for appellant Niagara Fire Ins. Co.

Byrom, Wright, Butcher & Prager and Don Prager, Fort Worth, for appellant Eliot J. Cashdan and for appellee Numismatic Co. of Texas.

Cantey, Hanger, Gooch, Cravens, Scarborough, and Sloan B. Blair, Fort Worth, for appellee The North River Ins. Co.

LANGDON, Justice.

Suit upon a personal property insurance policy was brought by Eliot J. Cashdan against his insurer, North River Fire Insurance Company, to recover the value ($14,589) of a group of rare coins stolen by armed robbery. Combined with it was the suit of Numismatic Company of Texas,

a corporation, d/b/a Ridglea Coin & Stamp Mart, against its insurer, Niagara Fire Insurance Company, to recover for the identical loss. In order to determine under which policy the loss fell, the question for decision is whether the coins were owned by Cashdan individually, or by Numismatic Company of Texas, at the time of the robbery. The district court, trying this case without a jury, held that the coins were owned by Numismatic Company of Texas. Judgment was rendered that Numismatic Company of Texas recover against its insurer Niagara Fire Insurance Company, and that Eliot J. Cashdan take nothing by reason of his suit against his insurer, North River Insurance Company. Niagara and Cashdan appeal.

Since there are two appellants and two appellees involved in this litigation we will for convenience hereafter refer to Eliot J. Cashdan as Cashdan; Numismatic Company of Texas, as Numismatic; North River Fire Insurance Company, as North River; and Niagara Fire Insurance Company, as Niagara.

North River insured coins owned by Cashdan individually. Niagara insured the corporation, Numismatic. against the loss of its property.

Numismatic sought and obtained recovery as owner of the stolen coins. The district court held that a sale of coins from Cashdan to Numismatic occurred before the robbery. If Numismatic owned the coins Niagara concedes that its policy covered the loss. If the coins remained the property of Cashdan, the loss is covered under the North River policy.

Appellant Niagara appeals such judgment on the ground that the coins remained the property of Cashdan. The broad question presented by Niagara's appeal is: Did Numismatic own the coins at the time they were stolen?

The facts are virtually uncontested. Cashdan was, and is, a full time executive in the retail shoe business and a private collector of rare coins. In September of 1961 his "hobby" as a collector of coins became so time consuming that he formed a corporation, Numismatic. Thereafter, Eddie Ross Parrish, secretary and treasurer of the corporation, and manager of the coin store owned and operated by Numismatic, became a shareholder. At about that time, Mike Brownlee, an outside salesman employed by Numismatic, became a shareholder.

Cashdan was, and is, president of Numismatic. He draws no salary. He did not "run said business". He was not active in its management, and he did not work in the store. He acted only in an advisory capacity. He pleaded in his second amended original petition that he "maintains strict observance of the corporate entity". He so testified. Parrish managed the coin store and "runs the business".

Several weeks before the robbery in question, Cashdan mentioned to Parrish that he was going to transfer an unidentified amount of coins to the corporation. No objection was voiced. These coins were to be sold at a coin convention in Detroit in order to place Numismatic in a more liquid condition and thus of benefit to it. These coins were not identified; their total value was not discussed; the terms of the proposed transfer were not discussed. Parrish did not know until after the robbery, that Cashdan was asking $3,000.00 in cash, and the rest in shares of stock. Cashdan admits that he "had not definitely decided quantities or items". He did not know himself exactly how much cash he was going to ask for. It was the morning of the robbery, August 12, 1962, a Sunday, that he decided.

Early on that morning Cashdan took the coins from his home safe. He then and there listed such coins in the letter he wrote to Mike Brownlee. Niagara contends that such letter was an offer to sell the coins listed for the price and upon the terms stated therein. Cashdan considered it an "invoice". He listed the individual prices

of these coins, and the total value thereof at $14,589. He placed one copy of this letter in an ammunition box with the coins. He kept the original and one copy.

Cashdan arrived at the store in the Ridglea district of Fort Worth that Sunday morning. He found Parrish and two store employees had arrived shortly before. They were preparing coins to be taken to a coin show or bourse, being held that same day in Fort Worth at the Texas Hotel. Cashdan set the ammunition box of coins on the floor of the store. He handed Parrish either a copy or the original of the letter, saying, in substance, "Here are the coins to go to Detroit, and here is the list". There was no discussion as to the identity, or value of the coins at that time or what Cashdan expected to receive for them.

Parrish did not look in the box. He does not know of his own knowledge what was in the box. Parrish did not read the letter. He merely threw it on his desk. He did not read it until after the robbery. According to Parrish he had no opportunity to examine or to set any value on the coins. He did not look at the letter until about an hour after the robbery, when Cashdan arrived in response to his notification. Nobody employed by Numismatic knew the contents of the letter until after the robbery except Cashdan, its president.

Parrish put the box on a back counter before he left the store for the Texas Hotel with Cashdan and other employees. Cashdan remained at the hotel until about 5:00 p. m., then went home. Parrish, alone, brought the coins back to the store shortly after 7:00 o'clock that night. He parked in front of the store, turned off the burglar alarm, and unlocked the front door. He went to the rear of the store and turned on the lights. As he returned to the front to go out to his car, he was met by two men, one of which was armed. He was forced into the back room of the store. The bandits took store merchandise worth $600.00, and the ammunition box involved herein and its contents. (Niagara does not contest the judgment in so far as the $600.-00 in store merchandise is concerned. This part of the judgment has been paid without prejudice because it is undisputed that Numismatic was the owner of such coins).

Cashdan admitted that the prices had to be agreed to by Parrish as manager for Numismatic; that Cashdan's own evaluation was not final; that the prices were subject to readjustment; that Parrish "had to be satisfied". He and Parrish had disagreed as to the evaluation of coins before. On past occasions they were able to reach an agreement on values. Parrish likewise testified that such transfers were subject to his agreement, and that if the values were not, in his opinion proper, they would be readjusted. Parrish said he would have checked the list, the coins, and ascertained their value if he had had the chance.

Cashdan testified that, as far as he was concerned, ownership passed to Numismatic immediately upon his delivery of the box to the store.

Niagara predicates its appeal upon six points of error which fall into two basic contentions. One is that the essential elements of a consummated sale were absent and the other that Numismatic, a corporation, lacked the authority to take title to the coins absent approval by its Board of Directors to issue stock in payment therefor. Additionally it contends that there is no evidence and insufficient evidence to support the findings of the court that ownership of the coins had changed from Cashdan to Numismatic. We affirm.

On the first contention all of Niagara's authorities deal with instances in which either the buyer or seller is attempting to avoid the sale, thus bringing into question such matters as offer, acceptance and meeting of the minds. Although these are matters which may be legally significant as between the parties to the sale, they are not matters that are open to question by a stranger such as Niagara. Niagara contends that "Nobody employed by

Numismatic knew the contents of the letter until after the robbery", and that "No one representing Numismatic agreed to buy the coins." Niagara overlooks the fact that Cashdan was "employed by Numismatic" as its President, and he "knew the contents of the letter", and that he "representing Numismatic agreed to buy the coins".

It is apparent from the record that Cashdan in delivering the ammunition box containing the coins to the store did all that was required of him to consummate the sale between him and Numismatic. As a general rule, a sale is regarded as being executory until the seller has done whatever is necessary to give the buyer the right of possession. 50 Tex.Jur.2d 360. The coins were clearly accepted by Parrish based upon his acts and his testimony to this effect. Since there was a delivery and acceptance it is assumed the parties intended title to pass. Owens v. Daniel, 16 S.W. 2d 306 (Waco Civ.App., 1929, Dism.).

Niagara argues that Cashdan, individually, could not deal with the corporation represented by himself. Niagara finds it difficult to conceive that Cashdan could effect a change in ownership "in his own mind and between his own shoulders". Niagara cites no authority in support of any such position.

The question of intent is always a prime consideration in determining the validity of a contract.

It is unusual in this case that the parties to the transaction insist that a sale of the coins was intended. A third party, Niagara, contends otherwise. It contends that since price was not agreed upon the sale was not completed. Generally, in the absence of an agreed price the sale is upheld on the implied promise to pay a reasonable price or market price if same is ascertainable. Paschal v. Hart, 105 S.W. 2d 337 (Waco Civ.App., 1937, no writ hist.) ; Texas Farm Bureau Cotton Ass'n v. Stovall, 113 Tex. 273, 253 S.W. 1101

(1923) ; Burger v. Ray, 239 S.W. 257 (Dallas Civ.App., 1922, Dism.).

The orthodox rules and the authorities cited by Niagara in support thereof are the rules which have been established to ascertain the intent of the parties. Since there is no dispute between the parties as to their intent the rules have no application to the facts of this case. The clear and unmistakable intention of the parties is controlling. Republic Building & Loan Ass'n v. Simpson, 77 S.W.2d 1101 (El Paso Civ.App., 1935, Dism.).

It would be strange indeed, in the absence of fraud, to find no sale between two parties one of whom vigorously insisted it was his intention to sell and the other with the same vigor insisting it was his intention to buy.

On at least two prior occasions these same parties had handled sales in the same manner. A contract of sale made in contemplation of an established usage or practice among buyers and sellers will be construed in connection with such usage and practice. This is particularly applicable as between Cashdan and Numismatic. 50 Tex.Jur.2d 374; Rosenstock v. Wheeler, 310 S.W.2d 350 (Houston Civ.App., 1958, Refused) ; Kerr v. Taylor, 317 S.W.2d 589 (San Antonio Civ.App., 1958, Dismissed).

In the two past transactions of a similar nature between these same parties there were minor disagreements as to value or "market price" which were resolved by arbitration after the sale took place. See also Taylor Oil & Gas Co. v. Pierce-Fordyce Oil Ass'n, 226 S.W. 467 (Austin Civ.App., 1920, no writ hist.).

Contracts wherein an officer of a corporation represents himself and the corporation are subject to close scrutiny by the courts and will be set aside if fraud or unfairness appears. This is Hornbook law. But here again the setting aside of the contract must be at the instance of the

corporation. Even then the previous passage of title has already occurred. A court of equity simply sets it aside upon a showing of unfairness. The rule with respect to dealings between a corporation and its officers and directors is well stated in Vol. 3 of Fletcher Cyclopedia, Private Corporations, § 916, at page 336: "Without regard to whether the officer or officers dealing with the corporation were the principal or sole representative of the corporation in the transaction, of whether the corporation was represented wholly or principally by other officers, there are certain rules common to both classes of transactions, viz.:

"1. The transaction or contract is not void but is merely voidable, according to the great weight of authority. What is meant by this is merely that if no steps are taken to rescind or set aside the contract, it remains in force as a valid contract, although perhaps if application should be made to set it aside, the court would grant relief merely because of the relationship of the parties without regard to the fairness of the deal or the good faith of the parties." And § 917 of the same volume states as follows: "Except for a few straggling cases, of more or less doubtful authority, it is well settled in nearly all jurisdictions including the federal courts, that transactions or contracts wherein a director or other corporate officer is interested adversely to the corporation are not void, but are merely voidable at the option of the corporation, unless such dealings are otherwise void as being in contravention of public policy."

Moreover, such transactions are not open to the scrutiny of outsiders. Section 977, Fletcher, supra.

In the recent case of International Bankers Life Insurance Co. v. Holloway, 368 S.W.2d 567 (Tex.Sup.Ct., 1963), the court at page 576 of its opinion reiterated Texas' adherence to the above rules in holding: "Contracts between a corporation and its officers and directors are not void but are voidable for unfairness and fraud, with the burden upon the fiduciary of proving fairness."

In this case Niagara, a stranger to the transaction, not only has no standing to complain on the ground of self-dealing as between the corporation and Cashdan, but even if Niagara were permitted to assert the contention it here makes, there are at least two complete answers thereto: (1) the transaction would be merely voidable at the option of the corporation, and not void, so that nothing prevented the initial passage of title to the coins, and (2) the trial court has found as a fact that the transaction was fair and advantageous to the corporation, and has further found as a fact and as a conclusion of law that the corporation was not the alter ego of Cashdan. These findings are amply supported by the evidence and are unchallenged by Niagara or by any other party hereto.

■ The second contention of Niagara is that passage of title could not occur without board action. The point is not whether the corporation was authorized to issue the stock in consideration of the coins. The question is whether there existed any inhibition upon the power of the corporation to take bare title to the coins. The authority cited by Niagara all relate to the authority of the corporation to issue its stock. Let us assume that A sells an article of personal property to a corporation for a consideration agreed upon by its president and, as here, delivers the property to the buyer corporation. Assuming other elements of the sale are present, title then passes to the corporation upon delivery of the property, and the fact that the corporation is later unable or unwiling to pay the consideration does not in and of itself affect the prior passage of title. Niagara confuses authority of the corporation to pay the price with the question of the passage of title.

And while it may be that a stock subscription must be accepted by the board of directors, it does not follow that bare title may not be taken by a corporation without

board action. The cases and authorities cited by Niagara do not hold otherwise. In each of them the question before the court was one of value, and in each of them there was some complaint or disagreement within the corporation. Niagara cites nothing to support its contention that title may not pass to a corporation without board action. We find no authority for any such proposition.

■ In considering the no evidence points we have reviewed the evidence in its most favorable light in support of the findings of the trial court considering only the evidence and the inferences which support the findings and rejecting the evidence and the inferences which are contrary to the findings.

Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914); 38 Tex. Law Review 361, No Evidence and Insufficient Evidence Points of Error.

■ In connection with the point on sufficiency of the evidence we have considered and weighed all of the evidence in the case and have concluded that the findings of the court are not so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W. 2d 660 (1951).

"In a nonjury case, the trial court is the judge of the credibility of witnesses and the weight to be given their testimony, and findings of the Court are entitled to the same weight and conclusiveness on appeal as the verdict of a jury." 4 Tex. Jur.2d Appeal and Error—Civil, § 839, pp. 398, 399. See also pp. 399 to 405 of same text.

In view of what we have already said we see no necessity in discussing the points raised by the appellant, Cashdan as against North River. All points of error raised by Cashdan and Niagara are overruled and the judgment of the trial court accordingly affirmed.

Affirmed.