ACCEPTED
09-17-00005-CV
NINTH COURT OF APPEALS
BEAUMONT, TEXAS
12/13/2017 5:04 PM
CAROL ANNE HARLEY
CLERK

## NO. 09-17-00005-CV

**IN THE NINTH COURT OF APPEALS**

FILED IN
9th COURT OF APPEALS
BEAUMONT, TEXAS
12/13/2017 5:04:07 PM
CAROL ANNE HARLEY
Clerk

**YVONNE TRAHAN,**

*Appellant*

**V.**

**THE PREMCOR REFINING GROUP, INC.
d/b/a VALERO PORT ARTHUR REFINERY,**

*Appellee*

Appeal from Cause No. A-195,793-C
In the 58th District Court
Jefferson County, Texas
The Honorable Kent Walston, Presiding

## APPELLANT'S REPLY BRIEF

Levon G. Hovnatanian
Texas Bar No. 10059825
*hovnatanian@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON &
WIDSOM, LLP
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Brian Beckcom
Texas Bar No. 24012268
*brian@vbattorneys.com*
Byron C. Alfred
Texas Bar No. 24084507
*byron@vbattorneys.com*
VB ATTORNEYS, PLLC
6363 Woodway Drive, Suite 400
Houston, Texas 77057
(713) 224-7800 – Telephone
(713) 224-1701 – Facsimile

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS...................................................................................i

INDEX OF AUTHORITIES............................................................................ ii

ARGUMENT ................................................................................................1

I.     TRAHAN DID NOT FILE HER MOTION TO RECUSE LESS THAN 10 DAYS BEFORE THE DATE SET FOR TRIAL OR OTHER HEARING. .........................................................................1

II.    ABSENT AN EXTRAORDINARY CIRCUMSTANCE NOT PRESENT HERE, ERROR IN DENYING A MOTION TO RECUSE IS NOT HARMLESS. ...................................................................4

III.   WHETHER PREMCOR AND ACE INTENDED, UNDERSTOOD, OR AGREED THAT PREMCOR WAS COVERED BY THE POLICY IS IRRELEVANT; THE QUESTION IS WHETHER *THE POLICY ITSELF* ACTUALLY COVERED PREMCOR. .........................10

IV.   THE ALTERNATE EMPLOYER ENDORSEMENT DOES NOT APPLY...........................................................................................22

V.    TRAHAN WAS NOT PREMCOR'S EMPLOYEE. ..................................27

CONCLUSION AND PRAYER FOR RELIEF....................................................31

CERTIFICATE OF COMPLIANCE.................................................................32

CERTIFICATE OF SERVICE ........................................................................32

# INDEX OF AUTHORITIES

**PAGE**

**Cases**

*ANCO Ins. Servs. v. Romero*,
    27 S.W.3d 1 (Tex. App.—San Antonio 2000, pet. denied) ...............................10

*BP Am. Prod. Co. v. Red Deer Res., LLC*,
    526 S.W.3d 389 (Tex. 2017) ...................................................................................17

*Brosseau v. Ranzau*,
    911 S.W.2d 890 (Tex. App.—Beaumont 1995, no writ) ......................................5

*Coven v. Heatley*,
    715 S.W.2d 739 (Tex. App.—Austin 1986, writ ref'd n.r.e.) .............................4

*Debes v. Cahoots Entertainment, Inc.*,
    2014 WL 3386617 (Tex. App.—Beaumont 2014, no pet.) .........................18, 19

*DeWitt County Elec. Co-op., Inc. v. Parks*,
    1 S.W.3d 96 (Tex. 1999). .......................................................................................16

*Estes v. Republic Nat'l Bank of Dallas*,
    462 S.W.2d 273 (Tex. 1970) ...................................................................................21

*Fiess v. State Farm Lloyds*,
    202 S.W.3d 744 (Tex. 2006) ...................................................................................11

*First Bank v. Brumitt*,
    519 S.W.3d 95 (Tex. 2017). ...............................................................11, 12, 14, 16

*Fourth & Frankford Sonic, Ltd. v. Brown*,
    2011 WL 6846197 (Tex. App.—Amarillo 2011, no pet.) ...........................14, 24

*French v. Chevron U.S.A. Inc.*,
    896 S.W.2d 795 (Tex. 1995) ...........................................................13, 14, 16, 17

*Gaal v. State*,
    2010 WL 323574 (Tex. App.—Fort Worth 2010),
    *rev'd on other grounds*, 332 S.W.3d 448 (Tex. Crim. App. 2011) ......................7

*Galvan v. Pub. Utils. Bd.*,
778 S.W.2d 580 (Tex. App.—Corpus Christi 1989, no writ)..............................29

*Garza v. Exel Logistics, Inc.*,
161 S.W.3d 473 (Tex. 2005))..................................................................27

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
327 S.W.3d 118 (Tex. 2010).....................................................................11

*Great Am. Ins. Co. v. Primo*,
512 S.W.3d 890 (Tex. 2017).....................................................................17

*Halton v. Am. Risk Ins. Co.*,
2016 WL 2609286 (Tex. App.—Dallas 2016, no pet.)....................................30

*Hoffman v. Trinity Indus.*,
979 S.W.2d 88 (Tex. App.—Beaumont 1998, pet. dism'd by agr.) ...................24

*Hollen v. Leadership Homes, Inc.*,
502 S.W.2d 837 (Tex. Civ. App.—El Paso 1973, no writ) ..............................19

*In re Union Pacific Res. Co.*,
969 S.W.2d 427 (Tex. 1998)................................................................ *passim*

*James Stewart & Co. v. Law*,
149 Tex. 392, 233 S.W.2d 558 (1950)........................................................15

*Koskey v. Baker Hughes*,
2005 WL 1906964 (Tex. App.—Beaumont 2005, no pet.) ..............................27

*Little v. Delta Steel, Inc.*,
409 S.W.3d 704 (Tex. App.—Fort Worth 2013, no pet.) ................................20

*Maryland Cas. Co. v. Sullivan*,
160 Tex. 592 S.W.2d 783 (1960)...........................................................26, 27

*Mendenhall v. Clark*,
2012 WL 512657 (Tex. App.—Amarillo 2012, pet. denied).............................30

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*,
907 S.W.2d 517 (Tex. 1995)...............................................................17, 18

*Niagra Fire Ins. Co. v. Numismatic Co.*,
380 S.W.2d 830 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.)........19, 20

*Philadelphia Indemn. Ins. Co. v. White*,
490 S.W.3d 468 (Tex. 2016) ...................................................................13

*Pipkin v. Kroger Tex., L.P.*,
383 S.W.3d 655 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ...............1

*Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*,
467 S.W.3d 494 (Tex. 2015) ...................................................................12

*Smith v. Brown*,
66 Tex. 543, 1 S.W. 573 (1886) ...............................................................14

*Southland Royalty Co. v. Pan Am. Petroleum Corp.*,
378 S.W.2d 50 (Tex. 1964) (Calvert, C.J., concurring)................................15, 16

*State ex rel. Millsap v. Lozano*,
692 S.W.2d 470 (Tex. Crim. App. 1985)
(orig. proceeding) .................................................................................7

*State Farm Lloyds v. Page*,
315 S.W.3d 525 (Tex. 2010)...........................................13, 15, 16, 17

*Sun Oil Co. (Delaware) v. Madeley*,
626 S.W.2d 726 (Tex. 1981)....................................................................11

*Tittizer v. Union Gas Corp.*,
171 S.W.3d 857 (Tex. 2005)....................................................................21

*Tower Contracting Co. v. Flores*,
157 Tex. 297, 302 S.W.2d 396 (1957).........................................................13

*Tractor Supply Co. of Texas, L.P. v. McGowan*,
2016 WL 1722873 (Tex. App.—Waco 2016, pet. denied)..........................25, 26

*U.S. Enters. v. Dauley*,
535 S.W.2d 623 (Tex. 1976)....................................................................21

*Williams v. Glash*,
789 S.W.2d 261 (Tex. 1990) ....................................................................18

*Willis v. Donnelly*,
   199 S.W.3d 262 (Tex. 2006) ...............................................................10

*Young v. McKim*,
   373 S.W.3d 776 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) .............30

**Statutes**

TEX. LAB. CODE § 408.001(a) ...............................................................21

**Rules**

TEX. R. APP. P. 43.2(d) ......................................................................7

TEX. R. CIV. P. 18a ........................................................................5, 6

TEX. R. CIV. P. 18a(b)(1)(A) ..............................................................2, 3

TEX. R. CIV. P. 18a(b)(1)(B) .................................................................2

TEX. R. CIV. P. 18a(g)(7) .....................................................................6

TEX. R. CIV. P. 18b(b)(7)(C) .................................................................5

**Other Authorities**

3 COUCH ON INSURANCE
   § 40:30 (3d ed. 2014) ......................................................................25

# ARGUMENT

## I. TRAHAN DID NOT FILE HER MOTION TO RECUSE LESS THAN 10 DAYS BEFORE THE DATE SET FOR TRIAL OR OTHER HEARING.

Premcor says, "At the time Trahan filed her motion to recuse, a hearing was already scheduled in the case before Judge Walston on April 22, 2016. . . . Thus, as everyone recognized, Trahan's motion to recuse was filed 'after the tenth day before the date set for trial or other hearing.'" Brief at 12. As support for both statements, Premcor cites page 1255 of the clerk's record—a letter from Chevron's counsel which states in part there was a hearing set for April 22, 2016 on Chevron's motion for summary judgment against Premcor. CR 1255. For several reasons, the letter does not show Trahan's motion to recuse was untimely.

First, the letter is not evidence that a hearing was set for April 22, 2016; it merely states a *conclusion* that a hearing was set for April 22, 2016. *See Pipkin v. Kroger Tex., L.P.*, 383 S.W.3d 655, 670 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Second, the letter avers that Chevron *is passing the hearing*: ". . . Chevron U.S.A Inc. will pass the April 22, 2016 hearing on its Motion for Summary Judgment until Trahan's Motion to Recuse has been decided." CR 1255.

So Premcor's argument that Trahan did not file her motion to recuse less than 10 days before the date set for trial or other hearing is based on, not a notice

1

of hearing, but a letter stating the conclusion that a hearing was set and then *explicitly passing the alleged hearing*. Premcor cites no authority that, even if a hearing was actually set on April 22 in the first place, a hearing that was passed before the hearing on the motion to recuse can still satisfy the element of a "date set for . . . other hearing."

Premcor asserts Trahan never argued below that her motion to recuse was not filed after the tenth day before the date set for trial or other hearing. Brief at 12-13. On the contrary, Trahan prudently argued that her motion to recuse was timely under both the "knows" standard of rule 18a(b)(1)(A) and the "neither knew nor reasonably should have known" standard of rule 18a(b)(1)(B). For example, at the hearing on the motion to recuse, Trahan's counsel told the court: "I think the most important point on this issue, Judge, is that it relates back to when *I knew about it* or when anybody on our side *knew or reasonably should have known about it*." RR 13 (emphasis added). In her reply to Premcor's response to her motion to recuse, Trahan quoted both the "knows" standard of rule 18a(b)(1)(A) and the "neither knew nor reasonably should have known" standard of rule 18a(b)(1)(B). CR 1282-83. In the same instrument, Trahan argued that "neither Premcor, nor Ms. Trahan, *knew of the grounds for recusal* until Ms. Trahan's counsel discovered this information, through his own investigation, shortly before filing the motion requesting recusal." CR 1284 (emphasis added).

2

At the hearing on the motion to recuse, the court showed it understood that Trahan had argued both sections:

> . . . Time for filing the motion, which has been raised by the defendants in this case as well, in this the motion to recuse, according to Rule 18a, it *must be filed as soon as practicable after the movant knows of the grounds stated in the motion.* And must be—and Part (B) is "must not be filed after the tenth day before the date set for trial or other hearing unless before that day the movant either knew or reasonably should have known the Judge whose recusal is sought would preside at the trial or the hearing and that the grounds stated in the motion existed."

RR 12 (emphasis added). To ensure he grasped Trahan's position, the court then immediately asked Trahan's counsel, "Is that correct?" RR 12. Trahan's counsel responded, "That's correct, Judge." RR 12.

Following that, Trahan's counsel repeatedly invoked the standard of rule 18a(b)(1)(A):

- "I will say that as soon as I found out about this, I brought it to the Court's attention and filed my motion." RR 13.

- "[W]ithin a day of filing that motion we filed a motion requesting recusal." RR 14.

- "I do not want the analysis to be convoluted when it comes down to the issue of timeliness. We can make mention about the 2014 production of this document a million times throughout this hearing, your Honor; but in the end the analysis does not go to when we received the document. It goes to when we received—when we had knowledge." RR 42.

- "We found out, and we brought it to the Court's attention within four days of finding out. Well, we moved to recuse

3

within four days of finding out; but we brought it to the Court's attention within two days of finding out. So, certainly we've met our standard of timeliness." RR 43.

- "Because the analysis here goes to my knowledge. As the person who filed the motion requesting recusal, the analysis here goes to—it relates back to when I had knowledge." RR 53-54.

- "When I found out about this relationship I had to bring it to everybody's attention." RR 56.

Based on the above, Premcor's assertions that Trahan variously waived her argument, failed to preserve her argument, is estopped from making her argument, and invited error (Brief at 13-15) are incorrect.

Premcor also says "Trahan does not address the evidence bearing on Judge Wooldridge's finding that Trahan reasonably should have known of her grounds for recusal more than ten days before filing her motion" (Brief at 16), but the evidence Premcor discusses under that argument is virtually the same evidence addressed in Trahan's opening brief at pages 20 to 23. The Court should determine the recusal issue on its merits.

## II. ABSENT AN EXTRAORDINARY CIRCUMSTANCE NOT PRESENT HERE, ERROR IN DENYING A MOTION TO RECUSE IS NOT HARMLESS.

Though it contends error in denying a motion to recuse can be harmless, Premcor does not cite a single case in which an appellate court made that holding.

In *Coven v. Heatley*, 715 S.W.2d 739, 741 (Tex. App.—Austin 1986, writ ref'd n.r.e.), the court "overrule[d] the points complaining of error in denying Coven's motion to recuse Judge Mathews" because "any error" was "plainly harmless" "*since he did not preside at the hearing in which it was determined to dismiss Coven's suit.*" (Emphasis added.) That holding could not apply here, where Judge Walston was the judge who granted Premcor's motion for summary judgment and denied Trahan's. CR 2450, 2452.

Unless, after the erroneous denial of a motion to recuse, the judge decides to leave the lawsuit anyway, such a denial cannot be harmless. If the denial of a motion to recuse could be harmless error, then appellate review of a such a denial would be illusory; if the denial was not erroneous, the judge's subsequent rulings are legitimate, and if the denial *was* erroneous, the judge's subsequent rulings *still* are legitimate, *even though the judge should not have made those rulings in the first place*.

Rule 18a reveals a different policy. "The purpose of Rule 18a is to insure that all litigants have the opportunity to have an impartial judge preside over their case." *Brosseau v. Ranzau*, 911 S.W.2d 890, 892 (Tex. App.—Beaumont 1995, no writ). If a judge's third-degree or closer family member is to the judge's knowledge likely to be a material witness in the proceeding, the judge "*must*" be recused. TEX. R. CIV. P. 18b(b)(7)(C) (emphasis added). If a judge who "*must*" be

5

recused continues to make rulings, including the grant of final judgment, then an impartial judge did not preside over the case. Surely reversal is warranted when a judge who was not impartial under Rule 18a and whose recusal was required signed the final judgment.

Consider the result if Premcor's stance is correct. Premcor asserts that, "Because Premcor is entitled to summary judgment, as a matter of law, even the erroneous denial of Trahan's recusal motion did not cause the rendition of an improper judgment . . . The denial of Trahan's recusal motion therefore does not entitle Trahan to reversal of the summary judgment." Brief at 28. Under Premcor's argument, a final judgment that was signed by a judge who was not impartial under rule 18a and whose recusal was required is not reversible if it is right on the merits. But a judgment that was signed by a judge who was not impartial under rule 18a and whose recusal was required should never even be reviewed on the merits. It should be reversed summarily.

Rule 18a(g)(7) also supports Trahan's view. Under that rule, when a motion to recuse is granted, the regional presiding judge "*must* transfer the case to another court or assign another judge to the case." TEX. R. CIV. P. 18a(g)(7) (emphasis added). There is no option to leave the case with the recused judge and hope his subsequent rulings will be correct, making the decision to leave the case with the wrong judge harmless error.

6

Both Trahan and Premcor cite *In re Union Pacific Resources Co.*, 969 S.W.2d 427, 428 (Tex. 1998), in support of their position, but at least one court of appeals has concluded the opinion stands for automatic reversal. In *Gaal v. State*, 2010 WL 323574 (Tex. App.—Fort Worth 2010), *rev'd on other grounds*, 332 S.W.3d 448 (Tex. Crim. App. 2011), the defendant filed a motion to recuse the trial court, and the motion was denied. *Id.* at *1. Noting that "[w]e apply the rules of civil procedure to review the denial of a motion to recuse in a criminal case," the court of appeals held the court that heard the motion to recuse erred by denying it. *Id.* at *1-4. After so holding, the court of appeals immediately reversed the judgment and remanded the case, citing *Union Pacific* as support for its automatic reversal:

> Having sustained Gaal's fourth point regarding the denial of his motion to recuse, we reverse the trial court's judgment and remand this case for a new trial before a different judge. *See* TEX. R. APP. P. 43.2(d); *State ex rel. Millsap v. Lozano*, 692 S.W.2d 470, 479 n. 12 (Tex. Crim. App. 1985) (orig. proceeding) (noting that rule of civil procedure 18b affords "a trial before a different judge"); *see also In re Union Pac. Res. Co.*, 969 S.W.2d 427, 428 (Tex. 1998) ("If the appellate court determines that the judge presiding over the recusal hearing abused his or her discretion in denying the motion and the trial judge should have been recused, the appellate court can reverse the trial court's judgment and remand for a new trial before a different judge.").

*Id.* at *4.

*Union Pacific*'s context also supports Trahan's understanding of the case. The court of appeals had conditionally issued a writ of mandamus compelling the

7

trial court to vacate its order denying a recusal motion. 969 S.W.2d at 427. The supreme court held that, because the complaining party had an adequate remedy by appeal, mandamus relief was improper. *Id*. at 427, 429.

In so holding, the supreme court noted that, "[w]hen a judge continues to sit in violation of a constitutional proscription, mandamus is available to compel the judge's mandatory disqualification without a showing that the relator lacks an adequate remedy by appeal." 969 S.W.2d at 428. "This makes sense, because any orders or judgments rendered by a judge who is constitutionally disqualified are void and without effect." *Id*.

"Likewise, on timely objection, the disqualification of an assigned judge who is not a retired judge is mandatory . . . any orders entered by a trial judge in a case in which he is disqualified are void." 969 S.W.2d at 428. "Therefore, the objecting party is also entitled to mandamus relief without a showing that there is no adequate remedy by appeal." *Id*.

The supreme court then wrote, "In contrast, the erroneous denial of a recusal motion does not void or nullify the presiding judge's subsequent acts." 969 S.W.2d at 428. The court was not, as Premcor suggests (Brief at 26), saying that a specific showing of harm is required; it was drawing a distinction between void orders, which are subject to mandamus relief, and merely erroneous ones, which are not. Indeed, the next sentences in the opinion are, "While a judgment rendered

8

in such circumstances may be reversed on appeal, it is not fundamental error and can be waived if not raised by proper motion. Recognizing this distinction, our Rules of Civil Procedure expressly provide for appellate review from a final judgment after denial of a recusal motion." *Id*. (citations omitted).

The court then wrote, "If the appellate court determines that the judge presiding over the recusal hearing abused his or her discretion in denying the motion and the trial judge should have been recused, the appellate court can reverse the trial court's judgment and remand for a new trial before a different judge." 969 S.W.2d at 428. In context, "can" means is able to, i.e., the appellate court is able to simply reverse the erroneous judgment as opposed to granting extraordinary relief in an original proceeding.

The court's subsequent statement that "[t]his procedure is no different than the correction of any trial court error through the normal appellate process" (969 S.W.2d at 428) also relates to the context of mandamus. Again, consider the very next sentence: "As we have observed, 'an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. . . . [T]he 'delay in getting questions decided through the appellate process . . . will not justify intervention by appellate courts through the extraordinary writ of mandamus.'" *Id*. (quotations omitted). This contrasts the "normal appellate process" with an original mandamus proceeding.

9

*Union Pacific* supports a holding that the error in denying the motion to recuse was not harmless.

## III. WHETHER PREMCOR AND ACE INTENDED, UNDERSTOOD, OR AGREED THAT PREMCOR WAS COVERED BY THE POLICY IS IRRELEVANT; THE QUESTION IS WHETHER *THE POLICY ITSELF* ACTUALLY COVERED PREMCOR.

Premcor argues that because it and Ace intended, understood, and agreed that Premcor was covered by the policy, Premcor is covered by the policy; that when "the parties" do not dispute what the contract means, "the parties," not rules of construction, determine what it means. Brief at 31-41; *see* Brief at 8. This argument requires the Court to hold that Premcor was in fact a party to the policy. But the policy does not even mention Premcor. Generally, if an entity's name is omitted from a contract or there is no indication the entity agreed to be bound by the contractual promises, the entity is not a party to the contract. *See, e.g., Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) (concluding that, because business owner did not sign the contract, he was not individually a party to the contract his company entered into); *ANCO Ins. Servs. v. Romero*, 27 S.W.3d 1, 5-6 (Tex. App.—San Antonio 2000, pet. denied) (holding that because company's name was struck from agreement before its execution, company would not be deemed a party to the agreement).

Furthermore, if Premcor's contention is correct, then in determining the intent of the parties to a contract, the reviewing court can ignore the contract itself

10

and instead determine intent by what the parties *say* they intended. But well-established supreme court jurisprudence debunks Premcor's argument:

- "The parties' intent is governed by what they said in the insurance contract, not by what one side or the other alleges they intended to say but did not." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010).

- "Only where a contract is first found to be ambiguous may the courts consider the parties' interpretation. Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial." *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981).

- "[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them[.]" *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (quotation omitted).

Based on these and similar authorities, the Court should determine whether the policy provides coverage to Premcor by reviewing the policy itself instead of summarily concluding it does because that was Premcor and ACE's subjective intent, understanding, or agreement.

*First Bank v. Brumitt*, 519 S.W.3d 95, 99 (Tex. 2017). This case states, "'As a general rule, parties in Texas may contract as they wish,' . . . and only 'the parties to an agreement determine its terms[.]'" (Quotations omitted.) But by "determine its terms," the court did not mean *decide what the terms mean*, like a

11

court would do, but rather *decide which terms to use*, i.e., decide the language to be used in the contract. The court held the trial court erred by "permit[ing] the jury to consider extrinsic evidence as a basis for *adding a term to the parties' contract*," and that "[b]ecause the contract's language is unambiguous, the court—not a jury—should have determined the parties' intent as a matter of law, and it could not do so by relying on extrinsic evidence to create an intent that the contract itself does not express." 519 S.W.3d at 110 (emphasis added).

*Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503-04 (Tex. 2015). This case states, "[W]e are mindful that the parties to an agreement determine its terms, and courts must respect those terms as 'sacred,' absent compelling reasons to do otherwise." Again, by "determine its terms," the Court did not mean decide what the terms mean, but rather decide which terms to use in the contract. Indeed, the Court immediately supported its statement with the following cite: "*See Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95-96 (Tex. 2011) ('As a fundamental matter, Texas law recognizes and protects a broad freedom of contract. We have repeatedly said that 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding *shall have the utmost liberty of contracting . . .*')." 497 S.W.3d at 504 (emphasis added).

12

*Philadelphia Indemn. Ins. Co. v. White*, 490 S.W.3d 468, 475 (Tex. 2016). This case states, "As a general rule, parties in Texas may contract as they wish so long as the agreement reached does not violate positive law or offend public policy." Setting aside that Premcor is not a party to the contract to begin with, the fact remains that "the meaning [of an unambiguous contract] is determined as a matter of law *by the language used therein*." *Tower Contracting Co. v. Flores*, 157 Tex. 297, 302, 302 S.W.2d 396, 399 (1957) (emphasis added).

*French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995). This case states, "[I]n construing a written instrument the lawful intent of the parties must be looked to and must govern." But the immediately-preceding statement is, "*We must ascertain what was meant by the language used in the conveyance*, so we begin by noting the relevant canon of construction." *Id*. (emphasis added). A subsequent statement provides that "the court must look at *the entire instrument* to ascertain the intent of the parties." *Id*. (emphasis added). So while the issue is the intent of the parties, it is the intent expressed in the contract that controls; in other words, "[w]hen analyzing an insurance contract . . . [the court's] primary goal is to determine the contracting parties' intent *through the policy's written language. . . .* [The court's] analysis of the policy is *confined within the four corners of the policy itself.*" *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010) (emphasis added).

13

*French* also states that, "Because 'once a dispute arises over meaning, it can hardly be expected that the parties will agree on what meaning was intended,' courts use canons of construction to help ascertain the parties' intent.'" 896 S.W.2d at 797 (quotation omitted). The court did not mean that rules of construction do not apply if a non-party to the contract makes an issue of its terms. If that were true, courts would not apply rules of construction to contracts in third-party beneficiary cases, but instead would simply look to the contracting parties' subjective expressions of what they intended. Of course, that is not the law. *See, e.g., Brumitt*, 519 S.W.3d at 110 ("Here, the trial court permitted the jury to consider extrinsic evidence as a basis for adding a term to the parties' contract, instructing the jury that the parties' intent to make Brumitt a third-party beneficiary could be established 'using other evidence' if 'the intent to benefit a third party is not expressed in the contract' itself. Because the contract's language is unambiguous, the court—not a jury—should have determined the parties' intent as a matter of law, *and it could not do so by relying on extrinsic evidence to create an intent that the contract itself does not express*.") (emphasis added).

<u>Smith v. Brown</u>, 66 Tex. 543, 545, 1 S.W. 573, 574 (1886). This case states, "In construing a written instrument the lawful intent of the parties must be looked to, and must govern." But courts "must ascertain what was meant by the language used in the conveyance[.]" *French*, 896 S.W.2d at 797. So while the issue is the

14

intent of the parties, it is the intent expressed in the contract that controls; in other words, "[w]hen analyzing an insurance contract . . . [the court's] primary goal is to determine the contracting parties' intent *through the policy's written language. . . .* [The court's] analysis of the policy is *confined within the four corners of the policy itself.*" *Page*, 315 S.W.3d at 527 (emphasis added).

*James Stewart & Co. v. Law*, 149 Tex. 392, 398, 233 S.W.2d 558, 561 (1950). This case states, "Courts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed." But that mere assumption does not nullify the rules of contract construction—rules such as "[w]hen analyzing an insurance contract . . . [the court's] primary goal is to determine the contracting parties' intent through the policy's written language. . . . [The court's] analysis of the policy is confined within the four corners of the policy itself." *Page*, 315 S.W.3d at 527.

*Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 58 (Tex. 1964) (Calvert, C.J., concurring). Chief Justice Calvert wrote, "Once a dispute arises over meaning, it can hardly be expected that the parties will agree on what meaning was intended. It is for this reason that the courts have built up a system of rules of interpretation and construction to arrive at meaning, ignoring testimony of subjective intent." He continued:

> "Intention of the parties" is often guesswork at best. Sometimes the true intention of one or even of both parties may be defeated, as when

15

the rule is applied of giving a contract the meaning its plain, clear language implies, irrespective of what the parties may claim it was intended to mean. So, while use of rules of interpretation and construction may not always result in ascertaining the true intention of parties in using particular language in a contract, their use yet must be better than pure guesswork in most cases else they would never have been evolved.

*Id*.

Chief Justice Calvert did not mean that rules of construction do not apply if a non-party to the contract makes an issue of its terms. Again, if that were true, courts would not apply rules of construction to contracts in third-party beneficiary cases, but instead would simply look to the contracting parties' subjective expressions of what they intended. That is not the law. *See Brumitt*, 519 S.W.3d at 110.

*DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999). This case says, "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." But it is also that plain grammatical meaning by which the court *determines* intent: "We must ascertain what was meant by the language used in the conveyance[.]" *French*, 896 S.W.2d at 797. "When analyzing an insurance contract . . . [the court's] primary goal is to determine the contracting parties' intent through the policy's written language. . . . [The court's] analysis of the policy is confined within the four corners of the policy itself." *Page*, 315 S.W.3d at 527. "The goal of contract interpretation is to

16

ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).  And, "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument."  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

*BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017). This case states, "We give the lease's language its plain meaning unless doing so would clearly defeat the parties' intent."  But the previous sentence is, "When construing an unambiguous lease, 'our primary duty is to ascertain the parties' intent *as expressed within the lease's four corners*.'"  *Id.* at 393-94 (emphasis added) (quotation omitted).  In other words, it is that plain meaning by which the court determines intent:  "We must ascertain what was meant by the language used in the conveyance[.]"  *French*, 896 S.W.2d at 797.  "When analyzing an insurance contract . . . [the court's] primary goal is to determine the contracting parties' intent through the policy's written language. . . .  [The court's] analysis of the policy is confined within the four corners of the policy itself."  *Page*, 315 S.W.3d at 527.  "The goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used."  *Primo*, 512 S.W.3d at 893.  And again, "The primary concern of a court in construing a written contract is to

17

ascertain the true intent of the parties as expressed in the instrument." *CBI Indus*., 907 S.W.2d at 520.

*Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990). Premcor says this case stands for the proposition that "[i]ntent, not plain language, is paramount and controlling." Brief at 38. Neither *Williams* nor any other case makes so radical and sweeping a holding. And *Williams* was a mutual mistake case. The rules are different in those cases—for example, "When mutual mistake is alleged, the task of the court is not to interpret the language contained in the release, but to determine whether or not the release itself is valid." 789 S.W.2d at 265. "If it can be established that a release sets out a bargain that was never made, it will be invalidated. If the objective manifestation of the parties' intent—i.e., their conduct—indicates that no release of unknown personal injuries was contemplated, the courts cannot provide intent for them." *Id*. Premcor did not allege mutual mistake here.

Premcor also relies on this Court's statement in *Debes v. Cahoots Entertainment, Inc.*, 2014 WL 3386617, at *3 (Tex. App.—Beaumont 2014, no pet.), that "we give the language of an agreement its 'plain grammatical meaning unless to do so would defeat the parties' intent.'" (Quotation omitted.) But Premcor ignores what comes before: "Resolution of the parties' dispute requires interpretation of the lease. In construing a written contract, the primary concern of

18

the court is to ascertain and give effect to the true intentions of the parties *as expressed in the written instrument. . . .* To achieve this result, '*we must examine and consider the entire writing . . .*'" *Id.* (emphasis added) (quotation omitted).

Premcor likewise relies on *Niagra Fire Ins. Co. v. Numismatic Co.*, 380 S.W.2d 830, 834 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.). In the 55 years since it was decided, *Niagra Fire* has been cited only once—for the unremarkable proposition that in a bench trial, the judge determines the credibility of the witnesses and the weight to be given their testimony. *See Hollen v. Leadership Homes, Inc.*, 502 S.W.2d 837, 839 (Tex. Civ. App.—El Paso 1973, no writ).

Whether correct on the merits or not, *Niagra Fire* is meaningfully distinguishable. The trial court found that ownership of some rare coins passed from Cashdan to Numismatic. 380 S.W.2d at 833. Niagra did not argue that either Cashdan or Numismatic was not a party to the sales contract; it argued there *was no* sales contract:

> Niagara predicates its appeal upon six points of error which fall into two basic contentions. One is that the essential elements of a consummated sale were absent . . .

> On the first contention all of Niagara's authorities deal with instances in which either the buyer or seller is attempting to avoid the sale, thus bringing into question such matters as offer, acceptance and meeting of the minds. . . .

19

*Id.* The court of appeals held that, "Although these are matters which may be legally significant as between the parties to the sale, they are not matters that are open to question by a stranger such as Niagara." *Id.*

Similarly, Niagra "contend[ed] that since price was not agreed upon the sale was not completed." 380 S.W.2d at 834. But "[t]he orthodox rules and the authorities cited by Niagara in support thereof are the rules which have been established to ascertain the intent of the parties. Since there is no dispute between the parties as to their intent the rules have no application to the facts of this case." *Id.*

*Niagra Fire* is not analogous. Trahan is not saying there was no insurance policy; she is saying Premcor, who is not mentioned in the policy, is simply not a party to it. *Niagra Fire* is about whether the parties to the contract agreed on a sale, not who the parties to the contract were.

Citing *Little v. Delta Steel, Inc.*, 409 S.W.3d 704 (Tex. App.—Fort Worth 2013, no pet.), Premcor also contends Trahan is estopped from challenging the agreement because she accepted benefits under the policy. Brief at 31. But Judge Walston granted Premcor summary judgment specifically on its exclusive remedy affirmative defense, not on estoppel. CR 2450.

Furthermore, "As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court

20

committed error in giving it to him." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005). Clearly, Trahan has not done that. And there is nothing inconsistent about Trahan accepting benefits paid under Valero Energy Corporation's policy and suing another, uncovered entity, Premcor, for negligence. Indeed, the Act allows it. *See* TEX. LAB. CODE § 408.001(a).

Premcor also invokes reformation. *See* Brief at 40. The equitable remedy of reformation is available to correct a mutual mistake in the written instrument. *Estes v. Republic Nat'l Bank of Dallas*, 462 S.W.2d 273, 275 (Tex. 1970). Premcor did not plead or request reformation, so that remedy cannot apply here: "It should be remembered that no reformation was sought by U.S. Enterprises to correct any mutual mistake as to the names of the surveys or other descriptive deficiencies. Thus, throughout this case we are in the position of interpreting the effect of what the parties expressed in their written contract (and attached map) rather than what they may have intended to express." *U.S. Enters. v. Dauley*, 535 S.W.2d 623, 630 (Tex. 1976). Because reformation does not apply, Premcor cannot rely on it to use otherwise-irrelevant parol evidence to show the alleged intent of the parties to the contract. *Estes*, 462 S.W.2d at 275.

Finally, Premcor argues that Trahan cannot dispute Premcor's election to obtain coverage. Brief at 41-43; *see* Brief at 8. But the policy at issue does not

21

insure Premcor; Premcor *has no* coverage. Whether Premcor wanted it or not is beside the point.

## IV. THE ALTERNATE EMPLOYER ENDORSEMENT DOES NOT APPLY.

Pointing to the Alternate Employer Endorsement on page 229 of the clerk's record, Premcor says the Endorsement applies and that Trahan, by citing the Alternate Employer Endorsement on page 190 of the clerk's record, "is looking at the wrong endorsement." Brief at 44. The version on page 190 states, "This endorsement is not applicable in . . . TX." CR 190. The version on page 229 does not say whether the endorsement is applicable in Texas, but Premcor says it is because under "State of Special or Temporary Employment," it lists "TX." Brief at 44. However, as discussed in Trahan's opening brief and below, Trahan was not in the course of special or temporary employment by anyone. *See* CR 1654.

Furthermore, the Alternate Employer Endorsement on page 229, like the one on page 190, includes a schedule that contains a category, entitled "Alternate Employer," under which alternate employers are to be listed. CR 229, 190. Premcor is not listed as an alternate employer on either page. CR 229, 190. Indeed, on both pages, only two words appear under the category of Alternate Employer: "IF ANY." CR 229, 190. Contrary to Premcor's argument (Brief at 44-45, 47), "IF ANY" does not mean "ANY." The words "IF ANY" show the parties to the policy did not have any entity in mind as an alternate employer.

22

Although "IF ANY" does not indicate "Premcor," Premcor says it is "a special employer granted coverage under the Alternate Employer Endorsement." Brief at 45-46. To do so, it challenges what it describes as "one witness's testimony." Brief at 46. The witness, who Premcor does not identify, testified as follows:

> Q. . . . [T]he alternate employer endorsement says that "premium will be charged for employees while in the course of special or temporary employment by the alternate employer." And I think we've already discussed that you're not contending that Ms. Trahan was, in fact, in any type of special or temporary employment relationship; correct?
>
> MR. EAVES: Objection, form.
>
> A. *Not to my knowledge, she was not. She was an employee of the Premcor Refining Group*.
>
> Q. (By Mr. Alfred) So, that's nothing special or temporary about that; right?
>
> A. *Not to my knowledge. She's an employee, a full-time employee of the Premcor Refining Group*.

CR 1654-55 (emphasis added). The witness was Theodore Guidry, Premcor's corporate representative (CR 1808).

Guidry's testimony at the least raises a genuine issue of material fact on whether Trahan was somehow a special employee. Indeed, if Trahan really was "a full-time employee of the Premcor Refining Group," she could not have been a

special employee of Premcor; Premcor could not possibly have been a general employer of Trahan *and* a special employer of Trahan:

> Texas courts recognize that the general employee of one employer may become the special employee or 'borrowed servant' of **another** employer. The "borrowed servant" doctrine is implicated when the nominal or general employer loans or supplies an employee **to another**, who is termed the special employer. . . . The test for determining whether a person is the employee of the original employer **or** of the borrowing employer is whether the employee is subject to the specific direction and control of the loaning **or** the borrowing employer. . . .

*Hoffman v. Trinity Indus.*, 979 S.W.2d 88, 90 (Tex. App.—Beaumont 1998, pet. dism'd by agr.) (citations omitted) (emphasis added). Premcor cannot have it both ways.[1]

Also, Premcor has asserted that Valero Energy Corporation was not Trahan's employer and lacks employees altogether. *See* CR 1359; *see also* CR 1351. Premcor goes so far as to say that "no such evidence or valid argument exists" that Valero Energy Corporation is Trahan's employer and that "Valero Energy Corporation *has no employees*." CR 1351 (emphasis in original). If any of those representations are true, Premcor could not possibly be Trahan's *special*

---

[1] Premcor points out that the witness said "[n]ot to my knowledge" (Brief at 46), but makes no argument that the phrase somehow nullifies the subsequent testimony. It does not. *See Fourth & Frankford Sonic, Ltd. v. Brown*, 2011 WL 6846197, at *9 (Tex. App.—Amarillo 2011, no pet.).

24

employer; it necessarily would be her *general* employer, because it would be her *only* employer.

Premcor also says that "blanket additional insured endorsements are commonplace throughout the insurance field." Brief at 46. Regardless, Premcor was not covered under a blanket additional insured endorsement. "A blanket additional insured endorsement generally provides coverage for any person or organization to whom or to which *the named insured is obligated to name as an additional insured by virtue of a written contract or agreement.* For example, in the construction industry, subcontract agreements commonly contain specific provisions requiring the subcontractor to name the general contractor as an additional insured on the subcontractor's commercial general liability policy. Thus, the general contractor would constitute an additional insured pursuant to the blanket endorsement under these circumstances." 3 COUCH ON INSURANCE § 40:30 (3d ed. 2014) (emphasis added). Premcor does not point to any written contract or agreement that obligates any of the named insureds to name Premcor as an additional insured.

Premcor says the policy in *Tractor Supply Co. of Texas, L.P. v. McGowan*, 2016 WL 1722873 (Tex. App.—Waco 2016, pet. denied), "did not even indirectly refer to Tractor Supply," yet the court of appeals still held there was coverage. Brief at 47. But the policy did indirectly refer to Tractor Supply. The court of

25

appeals held that Tractor Supply established it was covered by the policy obtained by Job Link because, "[a]lthough Tractor Supply is not named in the policy as an alternate employer, *the policy refers to the alternate employer as 'blanket'* and Job Link *provided [the insurer] with a list of client companies and their respective job descriptions*." 2016 WL 1722873, at *3 (emphasis added).

By contrast, here there is no combination of a "blanket" reference and a list of eligible companies. On the contrary, there is the conspicuous phrase, "IF ANY." CR 190, 229.

Premcor says "Valero Energy Corporation could not have avoided obtaining coverage for Premcor under the ACE policy" because "a subscribing employer may not split its workforce by electing to obtain coverage for the employees of some subsidiaries but not for those of another subsidiary in the same general class of business." Brief at 49-50 n.4 (citing *Maryland Casualty Co. v. Sullivan*, 160 Tex. 592, 334 S.W.2d 783 (1960)). Premcor is suggesting it is covered because if it is not covered, Valero Energy Corporation violated the rule in *Sullivan*. Whether Valero Energy Corporation violated the rule or not, there is no authority to support such a result-oriented reading of the policy.

Furthermore, the *Sullivan* Court wrote that "we understand the true rule to be that where an employer procures coverage for a part of his employees under the Workmen's Compensation Act, this coverage will extend to all the other of his

26

employees who work in the same general class of business." *Id.* at 596, 786. Premcor's reliance on this rule contradicts its (incorrect) assertions that Valero Energy Corporation was not Trahan's employer and is "an entity with no employees." *See* CR 1359; *see also* CR 1351. In any event, applying the rule here would mean that when Valero Energy Corporation procures coverage for some of its employees, the coverage extends to all of Valero Energy Corporation's other employees in the same type of business. It would not extend coverage to Premcor.

## V. TRAHAN WAS NOT PREMCOR'S EMPLOYEE.

In *Koskey v. Baker Hughes*, 2005 WL 1906964 (Tex. App.—Beaumont 2005, no pet.), this Court held that "[t]o determine if an entity is an employer, the [Texas Supreme] Court instructs that we are to 'consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury.'" *Id.* at *1 (quoting *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 477 (Tex. 2005)).

Premcor asserts that "[t]he exercise of actual control over the injury-causing work . . . is not a necessary prerequisite to proving the existence of an employee/employer relationship under the TWCA." Brief at 52. But under *Koskey* and *Garza*, it is a factor, and the record shows this factor favors Trahan. She collected the water sample to help out Dugas (CR 305, 1397), the person on

27

her crew whose primary duty was to collect water samples (CR 305, 1397), so Dugas could leave the refinery and attend a football game (CR 299, 305, 1391, 1397). There is no evidence Premcor even knew Trahan was going to collect the sample for Dugas, let alone exercised actual control over the details of the task.

Premcor urges the older right-to-control test (Brief at 55-57), but even under that standard, Premcor did not carry its burden. Gentry testified he has the right to control the day-to-day details of the work performed by the workers who operate the refinery, including Trahan. CR 349; *see* CR 471, 783, 1534, 1538-39, 1543, 1546. But he also testified he does not remember ever directing the methods, means and manner of Trahan's day-to-day work as it pertains to the operation of the refinery. CR 1539-40. He said he could not think of a single time since 2008 that he actually directed the day-to-day details of her work. CR 470, 780. He does not remember ever giving her a direct order to do anything. CR 1546. Likewise, he does not remember ever specifically planning her work hours or schedules. CR 471, 1537.

Trahan testified that Genry does not have the right to tell her what to do directly. CR 334. She specified that Gentry can fire someone if he finds them asleep on the job (CR 334) and can correct someone if he sees them doing something unsafe or against Premcor/Valero policy (CR 335).

28

Furthermore, while Gentry works for Premcor (CR 1563, 1804), he also works for Valero (CR 1563, 1795, 1805).  And the time of the accident, Citizen and Grey were the two people Trahan reported to (CR 329-30); while they worked for Premcor (CR 329-30), Citizen is also an employee of Valero (CR 1889).[2]

Trahan also testified that "Premcor/Valero" was the company that provided her the tools and equipment she used as part of her job duties at the refinery. CR 331-32.  She further stated it was "the refinery" that provided her with her safety equipment and the equipment she used on a day-to-day basis.  CR 333.

Trahan also testified very clearly that Valero bought the refinery from Premcor:

> Q.   How many different employers do you – would you say you've had?
>
> A.   With – with Valero?  Five.
>
> . . .
>
> Q.   . . . And then, at some point, Clark Refining bought the refinery.  Right?

---

[2]   Premcor says Citizen's testimony that he is Valero employee is "vague, and is not related to a specific question relating to Citizen's employment status[.]"  Brief at 59 n.5.  The testimony is not vague (*see* CR 1889), and accordingly Premcor did not object to it below.  *See Galvan v. Pub. Utils. Bd.*, 778 S.W.2d 580, 583 (Tex. App.—Corpus Christi 1989, no writ).  There is no requirement that testimony about employment be responsive to a specific question about employment.  Also, contrary to Premcor's assertion (Brief at 59, n.5), it does not appear that Citizen was referring to Valero Port Arthur Refinery at the time.  *See* CR 1889.

A.      (Moving head up and down)  Clark.

        . . .

Q.      All right.   And then at some point it became owned by Premcor?

A.      Premcor.  (Moving head up and down)

Q.      Or Valero or who do you think your – your employer was last?

A.      We – after Clark, then we were bought by Premcor . . . And then after – right before the Hurricane or whatever, *then we were acquired by Valero.*

Q.      Okay.  So that's the five.

A.      They bought us from – right.

Q.      That's the five.

A.      That's the five.  *They bought us from Premcor.*

CR 769-70 (emphasis added).

Premcor says this evidence does not count because it is "a page from her deposition that is attached to Chevron USA's motion for summary judgment against Premcor."  Brief at 57.  But when reviewing a summary judgment, the appellate court examines "the entire summary judgment record[.]"  *Halton v. Am. Risk Ins. Co.*, 2016 WL 2609286, at *2 (Tex. App.—Dallas 2016, no pet.); *Young v. McKim*, 373 S.W.3d 776, 780 (Tex. App.—Houston [14th Dist.] 2012, pet.

30

denied); *Mendenhall v. Clark*, 2012 WL 512657, at \*1 (Tex. App.—Amarillo 2012, pet. denied).  The Court may consider the testimony.

## CONCLUSION AND PRAYER FOR RELIEF

Trahan respectfully requests the relief she requested in her opening brief.

Respectfully submitted,

*/s/Levon G. Hovnatanian*
Levon G. Hovnatanian
Texas Bar No. 10059825
*hovnatanian@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON & WIDSOM, LLP
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Brian Beckcom
Texas Bar No. 24012268
*brian@vbattorneys.com*
Byron C. Alfred
Texas Bar No. 24084507
*byron@vbattorneys.com*
VB ATTORNEYS, PLLC
6363 Woodway Drive, Ste. 400
Houston, Texas 77057
(713) 224-7800 – Telephone
(713) 224-1701 – Facsimile

**ATTORNEYS FOR APPELLANT YVONNE TRAHAN**

31

## CERTIFICATE OF COMPLIANCE

This is to certify that this computer-generated Reply Brief contains 7,497 words.

/s/ Levon G. Hovnatanian
Levon G. Hovnatanian
December 13, 2017

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Reply Brief has been forwarded by the methods indicated below to the individuals listed below on this 13th day of December, 2017.

Michael K. Eaves
*meaves@calvert-eaves.com*
F. Blair Clarke
*fbclarke@calvert-eaves.com*
CALVERT, EAVES, CLARKE & STELLY, LLP
2615 Calder Avenue, No. 1070
Beaumont, Texas 77702
*(via e-File and e-Mail)*

Jennifer Bruch Hogan
*jhogan@hoganfirm.com*
Richard P. Hogan, Jr.
*rhogan@hoganfirm.com*
James C. Marrow
*jmarrow@hoganfirm.com*
HOGAN & HOGAN
711 Louisiana, Suite 500
Houston, Texas 77002
*(via e-File and e-Mail)*

/s/ Levon G. Hovnatanian
Levon G. Hovnatanian